John D. Freed (SBN 261518)
Jean M. Fundakowski (SBN 328796)
DAVIS WRIGHT TREMAINE LLP
50 California Street, Floor 23
San Francisco, California  94111
Telephone:     (415) 276-6500
Facsimile:     (415) 276-6599
Email:          jakefreed@dwt.com
                    jeanfundakowski@dwt.com

Grant Damon-Feng (SBN 319451)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, New York 10020-1104
Telephone:     (212) 603-6479
Facsimile:     (212) 379-5279
Email:          grantdamonfeng@dwt.com

Attorneys for Plaintiff
CONFLUENT, INC.

DAVIS WRIGHT TREMAINE LLP

# IN THE UNITED STATES DISTRICT COURT

# THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONFLUENT, INC., | Case No. 5:24-cv-4447 |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMAND** |
| SLOWER, LLC, and DOES 1 through 10, | |
| Defendants. | |

Case No. 5:24-cv-4447

COMPLAINT

**INTRODUCTION**

1. Plaintiff Confluent, Inc. ("Confluent") brings this action against Defendant Slower, LLC ("Slower") for breach of contract, violation of the Lanham Act, 15 U.S.C. § 1125(a), and violation of various California state laws.

2. This action arises out of a long-deteriorating partner relationship between Confluent and Slower, which has culminated in: (a) Slower's failure to pay over $700,000 in invoices undisputedly owed to Confluent; and (b) Slower's misrepresentations regarding its relationship with Confluent, and its misuse of Confluent's confidential and proprietary information, in an effort to divert customers from Confluent to Confluent's competitors.

**THE PARTIES**

3. Confluent is a Delaware corporation with its principal place of business in Mountain View, California. Confluent develops and sells subscriptions to Confluent Cloud and Confluent Platform, cloud services and software data streaming products, as well as related professional services.

4. Slower is a California limited liability company with its principal place of business in Irvine, California. As relevant to this case, Slower is a reseller of technology products and services, as well as a consultant and systems integrator providing technology consulting services.

5. Confluent is unaware of the true names and capacities, whether corporate, individual, association or otherwise, of the Defendants sued herein as Does 1-10 and therefore sues those Defendants by such fictitious names. Confluent will amend this Complaint to substitute the true names and capacities of those Defendants when the same are ascertained. Confluent is informed and believes and thereon alleges that at all times material hereto, each Defendant, including those fictitiously named, was the agent, employee, partner and/or joint venture of the other Defendants, and was at all times acting within the purpose and scope of such agency, employment, partnership and/or venture, with the knowledge, consent or ratification of each of the other Defendants in performing the acts alleged herein.

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1338(a) (jurisdiction over trademark), 28 U.S.C. § 1338(b) (unfair competition claim joined with a substantial and related claim under the trademark laws), and 15 U.S.C. § 1121(a) because this action arises under the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*  The Court also has supplemental jurisdiction over the claims arising out of state law under 28 U.S.C. §§ 1338(b) & 1367 because the state law claims arise out of the same operative facts as the federal claims.

7.      Jurisdiction and venue are proper in this Court because Slower's obligations arose and breaches and other wrongful acts took place in this District.  Slower also agreed that any dispute with Confluent that "shall be subject to the exclusive jurisdiction of and venue in the federal and state courts within Santa Clara County, California," and "consent[ed] to the personal and exclusive jurisdiction and venue of these courts."  *See* Ex. A § 13.5.

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

9.      This case is properly assigned on a District-wide basis pursuant to Civil L.R. 3-2(c) and the Court's Assignment Plan (General Order No. 44) because it arises out of Defendants' infringement of Confluent's intellectual property rights.

## FACTUAL ALLEGATIONS

### A.      Confluent's Registered Trademarks.

10.      Confluent is the owner of multiple federally registered trademarks for the word "Confluent," including Registration Nos. 4,892,856 and 5,728,103 ("Marks").  The above U.S. registrations for the Marks are valid, subsisting, in full force and effect, and are incontestable pursuant to 15 U.S.C. § 1065.  The registrations for the Marks constitute prima facie evidence of their validity and of Confluent's exclusive right to use the Marks under 15 U.S.C. § 1057(b).

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

**B.      The Reseller Agreement.**

11.      On or about June 12, 2020, Confluent and Slower entered into the Confluent Standard Reseller Agreement ("Reseller Agreement"), with an effective date of June 9, 2020.  A true and correct copy of the Reseller Agreement is attached as **Exhibit A** hereto and incorporated herein by reference.  The Reseller Agreement contained both monetary and non-monetary terms, which Slower has breached as alleged in detail below.

12.      Under the Reseller Agreement, Slower agreed to resell licenses to Confluent's software with associated services ("Products") to business end users on a worldwide basis.  Slower would thus buy Products directly from Confluent, at preestablished prices, and resell those Products to end users at resale prices set by Slower.  *See* Ex. A §§ 6.1, 6.2. 6.5.  The Reseller Agreement required Slower to pay Confluent the agreed-upon fees for any purchased Products within "60 days from the [Confluent] invoice date."  *Id.* § 6.5.  It also required Slower to "notify Confluent within 30 days of invoice date if it has any good faith basis to dispute amounts due."  *Id.* § 6.1.

13.      Under the Covenants section of the Reseller Agreement, Slower specifically agreed to: "(i) conduct business in a manner that reflects favorably at all times on the Products and the good name, good will and reputation of each party; (ii) avoid deceptive, misleading or unethical practices that are or might be detrimental to either party, the Products, or the public; (iii) make no false or misleading representations with regard to either party or the Products; (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to either party or the Products; and (v) make no representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Product that are inconsistent with the literature distributed by Confluent or [Confluent's End User License Agreement]."  Ex. A § 4.5.

14.      Under the Confidentiality section of the Reseller Agreement, Slower also agreed to "retain in confidence the non-public information and know-how disclosed or made available by [Confluent] pursuant to [the Reseller] Agreement which is either designated in writing as proprietary and/or confidential, if disclosed in writing, or if disclosed orally, is designated in writing (which may be via email) as confidential within thirty (30) days of the oral disclosure or

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

should reasonably be understood to be confidential by the recipient (the 'Confidential Information')." Ex. A § 12.1. Further, Slower agreed to: "(a) maintain the confidentiality of [Confluent's] Confidential Information; (b) refrain from using [Confluent's] Confidential Information except for the purpose of performing its obligations under [the Reseller] Agreement; and (c) not disclose such Confidential Information to any third party except to employees and subcontractors as is reasonably required in connection with the exercise of its rights and obligations under [the Reseller] Agreement (and only subject to binding written use and disclosure restrictions at least as protective as those set forth herein which the receiving party agrees to enforce))." *Id.* § 12.2.

15.    The Reseller Agreement had a one-year term, which automatically renewed on an annual basis, and was subject to termination both for convenience and for cause, upon written notice. *Id.* §§ 9.1, 9.2.

16.    Starting no later than 2020, Slower breached and continued to breach both the monetary and non-monetary provisions of the Reseller Agreement, as alleged in detail below. Confluent thereafter terminated the Reseller Agreement by giving written advance notice on April 15, 2024.

**C.    The Partner Agreement.**

17.    In June 2020, Confluent and Slower also entered into a Confluent Consulting and SI Partner Agreement ("Partner Agreement"), a true and correct copy of which is attached as **Exhibit B** hereto and incorporated herein by reference. Slower affirmatively renewed its assent to the terms of the Partner Agreement on November 9, 2023, while it was in the midst of engaging in the misconduct that is the subject of this Complaint. The Slower employee who executed this renewal on Slower's behalf is the same employee that sent the unlawful email correspondence described in detail in Section E below.

18.    Under the "Confluent Partner Logo & Partner Trademarks" section of the Partner Agreement, Slower "agree[d] that it will neither make nor authorize any use of the Confluent Marks [defined to include Confluent's trade names, trademarks, service marks, and logos] in any manner or on any material, or in connection with any Products/Services and/or Application, that is

4                                          Case No. 5:24-cv-4447

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

disparaging, pornographic, violent, obscene, indecent, unlawful, derogatory, defamatory, libelous, threatening, harassing, contrary to public policy or applicable law, statute, rule or regulation, and shall not use the Confluent Marks in any manner that diminishes or otherwise damages Confluent's goodwill in the Confluent Marks." Ex. B § 4.5. Slower also agreed that, except for uses not at issue in this case, it: "must receive Confluent's written consent prior to using the Confluent name and/or Confluent Marks, in any (i) internal or external market facing communications and/or listings; (ii) in any other type of publicity, including but not limited to press releases, marketing materials, and presentations (whether oral or written); and (iii) in any oral or written material including an endorsement or quote by Confluent." *Id.* § 4.7.

19. Under the Confidentiality section of the Partner Agreement, Slower promised to maintain Confluent's "Confidential Information"—defined to include, among other things, "customer … strategies and information"—"in confidence and disclose the Confidential Information only to its employees, subcontractors and consultants who have a need to know such Confidential Information in order to fulfill obligations of Recipient as set forth in this Agreement," and only after obtaining an equally restrictive confidentiality agreement from such recipients. Ex. B §§ 10.1-10.2.

20. Starting no later than 2020, Slower breached and continued to breach the Partner Agreement, as alleged in detail below.

**D.      Slower Fails to Make Payments Under the Reseller Agreement.**

21. Starting no later than 2022, Slower began a pattern and practice of breaching its obligations under the Reseller Agreement, by failing to make timely payments. Over the years, Confluent's representatives met with Slower's CEO, Rikin Shah, multiple times to address the situation. Mr. Shah made repeated assurances that all open payments would be made and that the relationship would be repaired, but as time passed Slower's performance continued to deteriorate. Notwithstanding Mr. Shah's promises that Slower would get current, two invoices remain entirely unpaid.

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

22.    On August 31, 2023, Confluent issued invoice #INV25311 to Slower, in the amount of $624,000.00, a true and correct copy of which is attached as **Exhibit C** to this Complaint.  The invoice was issued under the Reseller Agreement for Products resold to a Confluent customer.

23.    As of the date of this Complaint, Slower has not disputed the amounts due under invoice #INV25311.

24.    On October 30, 2023, 60 days after Confluent issued invoice #INV25311, Slower was obligated to pay invoice #INV25311.  As of the date of this Complaint, Confluent has not paid any amount of invoice #INV25311.

25.    On April 1, 2024, Confluent issued invoice #INV33042 to Slower, in the amount of $77,175.00, a true and correct copy of which is attached as **Exhibit D** to this Complaint.  The invoice was issued under the Reseller Agreement for Products resold to another Confluent customer.

26.    As of the date of this Complaint, Slower has not disputed the amounts due under invoice #INV33042.

27.    On May 31, 2024, 60 days after Confluent issued invoice #INV33042, Slower was obligated to pay invoice #INV33042.  As of the date of this Complaint, Confluent has not paid any amount of invoice #INV33042.

28.    As of the date of this Complaint, Slower owes Confluent the past due amount of at least $701,175.00, plus prejudgment interest thereon.

**E.    Slower Breaches Non-Monetary Terms of the Reseller Agreement and the Partner Agreement.**

29.    Starting no later than November 2023, while the Reseller and Partner Agreements were in effect, Slower began a surreptitious campaign to divert Confluent's customers to its competitors.

30.    Slower perpetrated this scheme by abusing and misrepresenting its status as a Confluent partner in a series of self-promoting emails to Confluent's customers.  In these emails, Slower repeatedly used Confluent's Marks—without the prior authorization required by the Partner Agreement—to make false statements about its relationship with Confluent and promised to lower

COMPLAINT

the customers' costs for Confluent's Products.  In actuality, on information and belief, Slower intended to lure customers away from Confluent to Confluent's competitors, including the third-party entity referred to herein as "**Competitor A**."

**Slower Emails to Confluent Customer A**

31.    For example, on November 7, 2023, Slower wrote to an existing Confluent customer, referred to herein as "**Customer A**," and falsely touted itself as "3 years in a row Confluent Partner of the year."  Slower was never the recipient of Confluent's "Partner of the Year" award.  Confluent gave this award for the first time in 2023, and while Confluent bestowed the title "Partner of the Year" on several partners across multiple categories, Slower did not win the award in any category.

32.    In the same email, Slower referenced a slide deck that had purportedly been presented by a Confluent executive "last week," falsely claiming that the executive had "called out Slower and the impact on [Confluent's] business and their customer's businesses" in a particular slide.  The subject slide deck does not mention Slower.  Slower's email instead appears to reference an "Investor Day" talk given by a Confluent executive five months earlier on June 13, 2023.  In the slide deck for that talk—not linked in Slower's email—Slower is referenced in a list of sixteen Confluent business partners, without any reference to Slower's impact on the business of Confluent or its customers.  The executive made no statement of any kind about Slower in her accompanying oral presentation.

33.    Two weeks later, on November 20, 2023, Slower sent another email     proposing a new service to Customer A to "help tier down your [Confluent] cost."

34.    Slower relentlessly continued to press Customer A on its Confluent costs, despite no apparent response from any Customer A representatives.  It emailed Customer A on December 14 and again on December 29, 2023.  In the latter email, Slower claimed it had "created a Cost Savings Acceleration team" for its "Confluent customers."  It then emailed Customer A about Confluent again on January 4, January 22, February 8, February 27, and April 12, 2024.  In its January 22, 2024 email to Customer A, after once again falsely touting itself as a "3-Time Confluent Partner of the Year," Slower pivoted and advertised its experience with Confluent's

COMPLAINT

competitors, including Competitor A.  Slower's attempts to sow customer concerns about Confluent were a predicate for efforts to divert Confluent's customers to those of its competitors.

**Slower Emails to Additional Confluent Customers**

35.     Slower sent a similar series of emails to another Confluent customer, referred to herein as "**Customer B**."  On November 3, 2023, Slower sent an introductory email to Customer B that was identical to the November 7, 2023 email Slower sent to the Customer A, including the false statement that Slower was "3 years in a row Confluent Partner of the year."  Slower sent follow-up emails to Customer B on November 16, December 14, and December 28, 2023.

36.     On information and belief, Slower sent the same or similar misleading emails to other Confluent customers in addition to Customers A and B, including one customer, referred to herein as "**Customer C**,"  that ultimately terminated its relationship with Confluent.

**Slower's Use of Confidential and Proprietary Confluent Information**

37.     On information and belief, Slower was able to send emails to Confluent's customers attempting to lure them away to Confluent's competitors because, under Slower's non-disclosure agreements with Confluent—including both the Reseller and Partner Agreements—it had access to certain confidential and proprietary Confluent information, including Confluent's customer lists. On information and belief, Slower unlawfully misappropriated Confluent's confidential customer information and disclosed it to Competitor A, allowing Slower and Competitor A to work together to poach Confluent customers.

38.     Confluent's customer lists are protectable trade secrets.  They are the product of extensive effort and economic expense by Confluent, which has spent years of time and millions of dollars developing its customer relationships.  These lists are valuable to Confluent because they are not known to the public or to Confluent's competitors.  Confluent's competitors would need to make massive investments of human and economic capital to replicate the market research and relationship development that Confluent has invested in creating its customer lists.  Confluent takes pains to protect the secrecy of its customer lists, disclosing them to necessary third parties (like Slower) only under cover of non-disclosure agreements.

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

**Harm to Confluent**

39.     Slower's misconduct caused at least one Confluent customer to terminate its relationship with Confluent, on February 26, 2024, resulting in lost revenue of at least $1.27 million per year.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

40.     Confluent incorporates and re-alleges paragraphs 1 through 39 above as if fully set forth herein.

41.     The Reseller and Partner Agreements are valid and enforceable agreements executed by the parties for consideration.  Confluent has fully performed all conditions precedent to enforce both the Reseller Agreement and the Partner Agreement, or is otherwise excused from the performance of its obligations due to the actions of Slower.

42.     Slower has breached the Reseller Agreement in multiple ways, including, among other things: (a) failing to make payments on invoices under the Reseller Agreement in a total amount of at least $701,175.00; (b) making false statements about its relationship with Confluent in outreach to Confluent's customers; (c) making unfavorable statements about Confluent's pricing in outreach to Confluent's customers; and (d) disclosing confidential Confluent information to unauthorized third parties, including but not limited to Competitor A.  Slower's conduct violates at least the following provisions of the Reseller Agreement: Sections 4.5, 6.5, 12.1, and 12.2.

43.     Slower has also breached the Partner Agreement in multiple ways, including, among other things: (a) using the Marks in a manner that diminishes or otherwise damages Confluent's goodwill; (b) using the Marks without receiving Confluent's prior written consent in external market-facing communications and in written material including supposed endorsements by Confluent; and (c) disclosing confidential Confluent information to unauthorized third parties, including but not limited to Competitor A.  Slower's Conduct violates at least the following provisions of the Partner Agreement: Sections 4.5, 4.7, 10.2.

44.     As a result of Slower's breaches, Confluent has incurred and is entitled to recover monetary damages in an amount to be proven at trial, but not less than $701,175.00 for Slower's

COMPLAINT

breach of Reseller Agreement § 6.5 and multiple millions of dollars for its breaches of Reseller Agreement §§ 4.5, 12.1, and 12.2 and Partner Agreement §§ 4.5, 4.7 and 10.2.

45. Confluent is entitled to prejudgment interest, costs, and attorney fees under Section 13.12 of the Reseller Agreement.

## SECOND CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage)

46. Confluent incorporates and re-alleges paragraphs 1 through 45 above as if fully set forth herein.

47. Confluent had ongoing economic relationships with certain customers, including but not limited to Customer C, which Confluent expected to continue into the future. Customer C was a Confluent customer from March 23, 2021 to March 28, 2024. Customer C declined to renew its Confluent subscription for the subsequent twelve-month period.

48. Slower was aware of Confluent's relationship with Customer C due to information provided by Confluent under cover of the confidentiality clauses of the Reseller Agreement and Partner Agreement.

49. On information and belief, Slower intentionally coordinated with Competitor A to poach Customer C, and in doing so disclosed confidential Confluent customer information to Competitor A. The Reseller Agreement and Partner Agreement prohibited Slower from making such disclosures to Competitor A. The Reseller Agreement also prohibited Slower from dealing with third parties in a manner that was detrimental to Confluent.

50. As a result of Slower's actions, Customer C discontinued its relationship with Confluent. The loss of the Customer C relationship resulted in at least $1.27 million in lost revenue for the twelve-month period beginning March 29, 2024, plus additional amounts for periods thereafter.

## THIRD CAUSE OF ACTION

### (California Uniform Trade Secrets Act, Cal. Civ. Code §§ 3426-3426.11)

51. Confluent incorporates and re-alleges paragraphs 1 through 50 above as if fully set forth herein.

DAVIS WRIGHT TREMAINE LLP

10                                    Case No. 5:24-cv-4447

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

52.     Confluent's customer lists are trade secrets.  They are the product of extensive investment of human and economic capital over a period of many years.  They derive value from not being generally known to the public, particularly from not being known to Confluent's competitors, who could seek to use them to divert customers away from Confluent.

53.     Confluent only discloses its customer lists to third parties where such third parties: (a) have a need for that information in connection with advancing Confluent's business interests, and (b) have agreed to treat that information confidentially by executing a non-disclosure agreement.  Confluent provided Slower with such confidential customer information for the purpose of enabling Slower to advance Confluent's business interests, including through Slower's work performed under the Reseller Agreement and Partner Agreement.  Confluent required Slower to agree to treat this information confidentially through the Reseller Agreement and Partner Agreement.

54.     Slower misappropriated Confluent's confidential and proprietary customer lists and used them for its own benefit by disclosing them to unauthorized third parties.  Confluent has been injured as a result of Slower's misuse of Confluent's trade secrets.

## FOURTH CAUSE OF ACTION

### (California Business & Professions Code § 17200)

55.     Confluent incorporates and re-alleges paragraphs 1 through 54 above as if fully set forth herein.

56.     The actions of Slower described above, including but not limited to its: (a) failure to make payments owed under the Reseller Agreement; (b) false statements about its relationship with Confluent in outreach to Confluent's customers; (c) unfavorable statements about Confluent in outreach to Confluent's customers; and (d) disclosure of confidential Confluent information to unauthorized third parties, including but not limited to Competitor A, constitute unlawful, fraudulent, and unfair business practices in violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

57.     Slower's conduct is unlawful in that it violates California contract law, tort law, and the California Uniform Trade Secrets Act, as described more fully herein.

COMPLAINT

DAVIS WRIGHT TREMAINE LLP

58. Slower's actions constitute unfair business practices in that they are practices that "offend[] an established public policy" and/or are "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1365 (2010). Slower's conduct also amounts to a threatened impact on competition. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 186-87 (1999). Specifically, Slower has made false statements about Confluent and misused Confluent's confidential customer information—provided to it under cover of a non-disclosure agreement—to divert customers from Confluent to Confluent's competitors.

59. Slower's conduct is fraudulent in that it is likely to deceive members of the public. At a minimum, Slower made repeated and materially false statements about its relationship with Confluent in emails to customers it sought to divert to Confluent's competitors.

60. Confluent has lost money and property as a result of Slower's unfair competition, including money associated with Slower's unpaid invoices and revenue lost due to Slower's illegal diversion of customers from Confluent to its competitors. Confluent is entitled to injunctive relief to, among other things, compel Slower to: (a) cease and desist from its unlawful disclosures of Confluent's proprietary and confidential information and its efforts to divert Confluent's customers to its competitors, and (b) disgorge and/or destroy all confidential Confluent information in its possession, custody, or control.

## FIFTH CAUSE OF ACTION

### (Federal Unfair Competition – 15 U.S.C. § 1125(a))

61. Confluent incorporates by reference the factual allegations contained in paragraphs 1 through 60 above as if fully set forth herein.

62. Confluent advertises, markets, and distributes its products using the Marks to distinguish its products and services from the products and services of others in the same or related fields.

63. Because of Confluent's long, continuous, and exclusive use of the Marks, they have come to mean, and are understood by customers, users, and the public to signify, products and services from Confluent.

COMPLAINT

64.     Slower has used, and on information and belief continues to use, the Marks to deceive customers.  As described above, Slower repeatedly made materially false statements about its relationship with Confluent as part of an effort to divert customers away from Confluent and to Confluent's competitors.  On information and belief, Slower's wrongful conduct misleads and confuses consumers as to the affiliation between Confluent and Slower, and as to Confluent's sponsorship and approval of Slower's commercial activities.

65.     Slower's acts constitute willful false statements in connection with goods and/or services distributed in interstate commerce, in violation of 15 U.S.C. § 1125(a).

66.     As a result of Slower's wrongful conduct, Confluent is entitled to recover its actual damages, Slower's profits, and treble damages and attorney fees pursuant to 15 U.S.C. § 1117(a)–(b).  The amount of money due from Slower to Confluent is unknown and cannot be ascertained without a detailed accounting by Slower.  Alternatively, Confluent is entitled to statutory damages under 15 U.S.C. § 1117(c).

## PRAYER FOR RELIEF

WHEREFORE, Confluent requests the following relief against Slower:

A.     That Slower be required to pay all actual damages that Confluent has sustained, or will sustain, as a consequence of Slower's unlawful acts, and that such damages be trebled as provided for by 15 U.S.C. § 1117(a)–(b), or otherwise allowed by law, plus prejudgment interest thereon.

B     For an award of injunctive relief, compelling Slower, its officers, agents, representatives, employees, successors and assigns, and all others in active concert or participation with them, to: (i) identify all disclosures of confidential Confluent information to any unauthorized third party; (ii) permanently cease and desist from disclosing confidential Confluent information to unauthorized third parties; (iii) permanently cease and desist from using the Marks in a false or misleading manner, or in any way falsely suggesting an affiliation between Confluent and Slower, or Confluent's sponsorship and approval of Slower's commercial activities; and (iv) return to Confluent and/or destroy all confidential Confluent information in its possession, custody, or control.

DAVIS WRIGHT TREMAINE LLP

COMPLAINT

C.     That Slower's profits from the tortious activity alleged in this Complaint be disgorged pursuant to 15 U.S.C. § 1117(a).

D.     That if greater than actual damages, Slower be required to pay the maximum statutory damages for its infringement of the Marks pursuant to 15 U.S.C. § 1117(c);

E.     For an award of reasonable attorney fees and costs incurred herein, as provided for by 15 U.S.C. § 1117, or otherwise by law.

F.     For such other relief as the Court deems just and equitable.

DATED July 23, 2024                              DAVIS WRIGHT TREMAINE LLP
                                                 Grant Damon-Feng
                                                 John D. Freed
                                                 Jean M. Fundakowski


                                                 By: */s/ Grant Damon-Feng*
                                                      Grant Damon-Feng

                                                 Attorneys for Plaintiff
                                                 CONFLUENT, INC.

DAVIS WRIGHT TREMAINE LLP

14                                                    Case No. 5:24-cv-4447

COMPLAINT

# EXHIBIT A

 CONFLUENT

**CONFLUENT**
**STANDARD RESELLER AGREEMENT**

This Standard Reseller Agreement (the "**Agreement**") is by and between Confluent, Inc., a Delaware corporation with its principal place of business at 899 West Evelyn Avenue, Mountain View, California 94041 ("**Confluent**") and Slower, LLC, a California limited liability company having a place of business at 3200 Park Center Drive, Suite #1400, Costa Mesa, CA 92626  ("**Reseller**") and is effective as of June 9, 2020  ("Effective Date").

**BACKGROUND**

Confluent develops and sells subscriptions to a software data management platform that includes open source and proprietary components and provides related services. Reseller has expertise in marketing such products and services to various industries and desires to resell the Confluent solution on the terms and conditions of this Agreement and in accordance with applicable Confluent channel partner programs.

**AGREEMENT**

1.    **DEFINITIONS.**

   **1.1.    "Confluent Offering"** means the license to the Proprietary Software together with the Support Services.

   **1.2.    "End User"** means a business entity that has purchased the Confluent Offering and/or Services to use internally for its own business purposes.

   **1.3.    "Exceptional Pricing"** refers to a discount or price deviation from Confluent's standard partner discount and pricing that may be made available by Confluent in exceptional circumstances as contemplated under Section 6.3.

   **1.4.    "Personal Information"** means information about an identified individual, or an individual that is reasonable identifiable, whether the information is true or not or recorded in a material form or not, as collected or generated by, disclosed to, or accessed by the Reseller under this Agreement.

   **1.5.    "Platform Software"** means the software solution that Confluent makes generally available to the public (which incorporates the Proprietary Software, open source components  developed by Confluent and open source components developed by third parties) including any updates Confluent provides to its customers without additional charge.

   **1.6.    "Price Book"** means Confluent's list prices (howsoever described) for its Products disclosed to the Reseller as contemplated under Section 6.2.

   **1.7.    "Privacy Laws"** means any applicable laws, regulations, codes or policies governing the collection, use, disclosure, storage or granting of access rights to Personal Information.

   **1.8.    "Products"** means the Confluent Offering and the Services.

   **1.9.    "Proprietary Software"** means software provided as part of the  Confluent Platform that was developed by Confluent and has not been contributed as open source.

   **1.10.    "Services"** means, as applicable, individually or collectively (a) training services, and (b) advisory services that Confluent generally makes available to the public.

   **1.11.    "Support Services"** means technical support services for the Platform Software.

   **1.12.     "Territory"** means worldwide.

933\3518975.3

**2. APPOINTMENT.**

**2.1.** Appointment as Reseller. Subject to all the terms of this Agreement, Confluent appoints Reseller to resell the Products to End Users in the Territory. Such appointment is made only for the Term and is non-exclusive and non-transferable. Reseller is not authorized to appoint sub-distributors. Reseller will procure orders for the Products, will determine its own prices for the Products and resell at prices established by it, and collect payment from the End User. Further, Reseller is responsible for passing through to the End User Confluent's end user license terms ("EULA") that govern the use of the Products. Reseller is not granted any licenses to the Products, or documentation associated with such Products. For orders for Services, Confluent may additionally require the End User to enter into a Statement of Work ("SOW") directly with Confluent regarding the specific provision of Services. Nothing contained herein shall restrict Reseller from having the right to obtain or retain the rights to resell any other products, including products that may compete with the Products, provided Reseller does not breach this Agreement in the process of reselling other products. For the avoidance of doubt, the Platform Software may incorporate third party open source software as referenced in the EULA and identified at http://www.confluent.io/third_party_software or in the applicable help, notices, about or source files ("Third Party Software"). The Third Party Software is provided by Confluent at no charge.

**2.2.** Terms of Service. Confluent provides the Products to End Users who have agreed to the EULA. The current EULA is available at https://www.confluent.io/subscription-agreement/ and may be updated by Confluent from time to time; provided, however, that any updates will not materially reduce the license rights granted to End User or the benefits set forth in the EULA. Reseller shall market the Products in such a manner as to require the End User to agree to the current EULA at the time of sale. By executing an Order (defined below) with Confluent, Reseller confirms that it will comply with the requirement to pass through the EULA terms to End User via an agreement between the Reseller and End User. Reseller is solely responsible for any liability incurred by it or Confluent as a result of failure to include in its agreements for the sale of the Products terms that require the End Users to agree to the applicable EULA. Such agreements must provide that Confluent (as a supplier) is an express third party beneficiary.

**3. ORDER PROCESS.**

**3.1.** Orders. Reseller will place a purchase order (each, an "**Order**") with Confluent for each End User. All Orders placed with Confluent will be subject to acceptance or rejection by Confluent at its sole discretion. Confluent shall notify Reseller of its receipt of each Order issued hereunder (each, an "Acknowledgement") within five (5) business days following Confluent's receipt thereof. Each Acknowledgement must confirm acceptance of the Order or advise Reseller of Confluent's rejection of such Order. All Orders shall be deemed to be accepted by Confluent unless Reseller receives written notice of rejection, along with reasonable details regarding the reason for such rejection, from Confluent within such five (5) day period. Confluent may require separate Orders to be placed for the Confluent Offering, including the Platform Software, and for Services.

**3.2.** An Order for Confluent Offering shall contain:

    a)    # of nodes per SKU

    b)    Start and end date

    c)    Subscription SKU

    d)    Technical contact phone

933\3518975.3

e)     Technical contact email

f)     Price payable to Confluent

g)     End User's full legal name, business address and contact information

**3.3.**     An Order for Services shall contain

a)     The applicable SKU for the Services

b)     Technical contact phone

c)     Technical contact email

d)     Quantity

e)     Price payable to Confluent

f)     End User's full legal name, business address and contact information

**3.4.**     <u>Delivery Process.</u> For orders of the Confluent Offering and Services, delivery of the Platform Software and Services, as applicable, will be from Confluent in accordance with the EULA. For Services, Confluent will provide the Services per an applicable Statement of Work with the End User. Confluent provides an online EULA, which Reseller has agreed to pass through to the End User, per Section 2.3 above. Reseller will cooperate in the contracting process for each End User, including but not limited to providing the necessary information regarding each End User to Confluent.

## 4.     MARKETING AND PROMOTION.

**4.1.**     <u>Promotional Efforts</u>. Reseller will market and promote the Products so as to generate sales in the Territory. Confluent will provide Reseller with marketing collateral from time to time, in its discretion, to be used in accordance with this Agreement. Reseller will submit any advertisements to Confluent and Confluent will approve, reject, or comment on such advertisement within 10 business days.  In the event Confluent has a concern with an advertisement by Reseller the parties will promptly address it.

**4.2.**     <u>Reseller Personnel</u>.  Reseller will train and maintain a sufficient number of capable technical and sales personnel having the technical expertise and training necessary to: (i) inform customers properly concerning the specifications, features and capabilities of the Products and how they compare to competitive products; (ii) service and support the End User in accordance with Reseller's obligations under this Agreement; and (iii) otherwise carry out the obligations and responsibilities of Reseller under this Agreement.

**4.3.**     <u>Training</u>.  Reseller will send at least two of its technical and/or sales personnel for training on the Products as the parties mutually agree upon. Certain training may be provided free of charge at the Confluent offices shown on page one of this Agreement and certain training will be provided for fees in accordance with Confluent's channel partner program. The amount of training time will be reasonable and appropriate in Confluent's judgment, all such training will be in English, and Reseller will bear all travel and living expenses for such personnel sent to Confluent for training.

**4.4.**     <u>Meetings and Trade Show Attendance</u>. Reseller will at its own expense: (i) attend, and promote Products in such trade shows, conventions and exhibits; (ii) attend any mutually agreed sales

3

933\3518975.3

meetings held by Confluent; and (iii) Reseller will notify Confluent of Reseller's sales meetings and provide Confluent personnel adequate opportunity to provide sales and promotion information regarding the Products in such meetings.

**4.5.** Reseller Covenants. Reseller will: (i) conduct business in a manner that reflects favorably at all times on the Products and the good name, good will and reputation of each party; (ii) avoid deceptive, misleading or unethical practices that are or might be detrimental to either party, the Products, or the public; (iii) make no false or misleading representations with regard to either party or the Products; (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to either party or the Products; and (v) make no representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Product that are inconsistent with the literature distributed by Confluent or the EULA.

**4.6.** Compliance with Law. Reseller and Confluent will comply with all applicable international, national, state, regional, and local laws and regulations in performing each party's duties hereunder and in any of its dealings with respect to the Products.

**4.7.** Compliance with U.S. Export Laws. Reseller acknowledges that the Platform Software including documentation and other technical data, are subject to export controls imposed by the U.S. Export Administration Act of 1979, as amended (the "Act"), and the regulations promulgated thereunder. Reseller will not export or re-export (directly or indirectly) any Platform Software or documentation or other technical data therefor without complying with the Act and the regulations thereunder. Confluent shall, upon request by Reseller, promptly provide all information necessary to export or re-export the applicable Products under this Agreement, including, as applicable, the Export Control Classification Numbers (ECCN).

**4.8.** Market Conditions and Sales Forecasting. Reseller will advise Confluent promptly concerning any market information that comes to Reseller's attention respecting the Products, Confluent's market position, or the continued competitiveness of the Products in the marketplace. Reseller will provide Confluent with any gathered market intelligence learned through prior sales efforts related to Confluent's product competitiveness. Reseller will provide quarterly sales forecasts and product offering plans relating to the Products on an annual basis provided that such forecasts and plans are non-binding.

**4.9.** Costs and Expenses. Except as expressly provided herein or agreed to in writing by Confluent and Reseller, each party will pay all costs and expenses incurred in the performance of its obligations under this Agreement.

**5.     OWNERSHIP; RESTRICTIONS.**

**5.1.** Ownership. Confluent and its licensors, as applicable, own all rights, title of interest in and to (i) the Confluent trademarks, service marks, logos, domain names, the product names and other branding elements ("Marks") of Confluent associated with the Products; (ii) Confluent Products, including the Proprietary Software and all intellectual property rights in the foregoing; and (iii) the materials associated with the delivery of the Products and Services. Other than as expressly set forth in this Agreement, no license or other rights under the Confluent intellectual property rights are granted to the Reseller, and all such rights are hereby expressly reserved.

**5.2.** Restrictions. Reseller shall not (i) license, sublicense, sell, resell, transfer, assign, distribute or otherwise commercially exploit or make available to any third party the Confluent Products or Services in any way, other than to resell to the Product to End Users as described in this Agreement and accepted

933\3518975.3

Orders; (ii) modify or make derivative works based on, reverse engineer or reverse compile the Proprietary Software; or (iii) knowingly interfere with or disrupt the integrity or performance of the Confluent Offering.

**5.3.**    Marks. Subject to the terms and conditions of this Agreement, Confluent grants Reseller a non-exclusive, non-transferable license to use the Marks in connection Reseller's marketing of the Products, provided that such use is in accordance with Confluent' trademark usage guidelines at

https://www.confluent.io/confluent-trademark-guidelines/ , which may be updated from time to time. Nothing in this Agreement grants Reseller ownership or any rights in or to use the Marks, except in accordance with this license. The rights granted to Reseller in this license will terminate upon any termination or expiration of this Agreement. Reseller shall not use or register any mark confusingly similar thereto. Upon such termination or expiration, Reseller will no longer make any use of any Marks.

## 6.    FEES AND PAYMENT.

**6.1.**    Fees. Fees for the Confluent Offering are on an annual subscription basis initially in accordance with Confluent's quote. Reseller will be billed for renewal terms at Confluent's then-current rates, unless Confluent has been notified of an End User's termination of the annual subscription. If Confluent's EULA contains an auto-renewal term, Confluent will not enforce such auto-renewal term against End Users. Reseller may establish, at its own discretion, the resale price of the Product. Reseller is not required to purchase any minimum amount or quantity of the Products. Reseller agrees that billing will be based on information collected by Confluent regarding the use of the Confluent Offering. Reseller will notify Confluent within 30 days of invoice date if it has any good faith basis to dispute amounts due.  The parties shall seek to resolve all such disputes promptly and in good faith. Notwithstanding anything to the contrary, Confluent shall continue performing its obligations under this Agreement during any such good faith dispute, which in no event shall last more than ninety days from invoice date.

**6.2.**    Pricing. Fees for certain Products will be established in accordance with a quote by Confluent based upon the Price Book. Confluent may modify the Price Book from time to time to add or remove Products or to reflect a change in prices, in each its sole discretion; provided that no Price Book changes will affect current Orders through the end of their applicable term and provided that Price Book changes must have been conveyed to Reseller at least sixty (60) days prior to each renewal date for each End User's subscription. Existing pricing provided by Confluent to Reseller will be honored for the time that the quote is valid or, in case the quote does not contain a validity date, for a period of sixty (60) days following the date the quote is transmitted to Reseller.

**6.3.**    Exceptional Pricing. Exceptional Pricing may apply for specific End User opportunities where necessary to meet competitive conditions, for which the following procedure will be followed: (a) Reseller may request Exceptional Pricing and for this purpose must provide sufficient accurate and complete information in support of the request as well as the name of the relevant End User; (b) Confluent will assess such request on an individual basis and will only apply for a specific End User and will be based on the accuracy and completeness of the documentation provided to it by Reseller; (c) the decision whether to agree to Exceptional Pricing and the detail of such Exceptional Pricing will be as determined by Confluent in its absolute discretion and will be based on such terms and additional requirements as Confluent will specify at that time and will be referenced on the relevant Order with a quote number to also appear on Reseller's purchase order; (d) Reseller will pass on the benefit of the Exceptional Pricing in full to the End User and will provide such documentation as Confluent may require to evidence this requirement; and (e) Reseller must inform Confluent immediately if any information relating to the request for Exceptional Pricing changes.

933\3518975.3

**6.4.**   Taxes, Tariffs. Reseller is responsible for payment of all taxes of every kind imposed in connection with the sale of Products or which Confluent may incur in respect of this Agreement including, without limitation, all sales, use, value-added, gross receipts, excise, withholding or other taxes of any nature, and any penalties, interest and collection costs associated with any of the foregoing items. All such amounts are in addition to other amounts payable hereunder and this obligation shall survive termination or expiration of this Agreement. In the event that a withholding tax is payable by Reseller, (a) Reseller will effect such withholding, remit such amounts to the appropriate taxing authorities and promptly furnish Confluent with tax receipts evidencing the payments of such amounts and (b) the sum payable by Reseller upon which the deduction or withholding is based will be increased to the extent necessary to ensure that, after such deduction or withholding, Confluent receives and retains, free from liability for such deduction or withholding, a net amount equal to the amount Confluent would have received and retained absent the required deduction or withholding.

**6.5.**   Payment Terms. All payments shall be made in United States dollars, free of any currency control or other restrictions to Confluent at the address designated by Confluent. The Fees shall be due 60 days from the invoice date unless otherwise specified by Confluent in writing. Reseller is solely responsible for pricing, payment terms, and collection as between Reseller and its End Users. If Reseller's account is thirty (30) days or more overdue and the amounts due to Confluent are undisputed, in addition to any of its other rights or remedies, Confluent reserves the right to suspend performance under this Agreement or an End User agreement until such amounts are paid in full.

## 7.   REPORTS.

**7.1.**   Notification. Reseller will: (a) notify Confluent in writing of any claim or proceeding involving the Products within ten (10) days after Reseller learns of such claim or proceeding; and (b) report promptly to Confluent all claimed or suspected product defects. Further, Reseller will (i) assist Confluent in every reasonable way in pursuing Confluent's rights and, upon consultation with Confluent, immediately take all steps for the protection of those rights; and (ii) temporarily stop marketing, positioning, providing and reselling the Products to any such third party unless and until such claim or proceeding is resolved.

**7.2.**   Records and Audit. Reseller will maintain, for at least two (2) years after termination of this Agreement, its records, contracts and accounts relating to the resale of Products, and will permit examination thereof by Confluent's independent auditors at reasonable times with reasonable advance written notice of such examination of at least thirty (30) days to confirm Resellers compliance with this Agreement. Examinations shall not occur more than once annually.

## 8.   WARRANTY DISCLAIMER.

**8.1.**   Confluent Warranty to End User. Confluent provides a warranty for the Proprietary Software directly to the End User. No warranty is made to Reseller regarding the functionality or performance of the Platform Software and no warranty is provided to Reseller on any Products.

**8.2.**   Disclaimer of Warranties. TO THE EXTENT PERMITTED BY APPLICABLE LAW, ALL WARRANTIES, EXPRESS AND IMPLIED, ARE HEREBY DISCLAIMED BY CONFLUENT INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.

**8.3.**   Reseller Representations. Reseller will make no warranties or representations on behalf of Confluent, including as to quality, merchantability, fitness for a particular purpose, or use, or any other feature of the Products other than as set forth in Confluent's published documentation.

6

933\3518975.3

**9.    TERM; TERMINATION; SURVIVAL.**

**9.1.**    Term. The term of this Agreement is one (1) year from the Effective Date (the "**Initial Term**") and, unless earlier terminated as set forth below, will automatically renew for subsequent one year terms (the each, a "**Renewal Term**") unless one party provides the other party with notice of its intent not to renew the Agreement no less than 30 days before the expiration of the Initial Term (the Initial Term and all Renewal Terms are collectively be referred as the "**Term**"). If the Term is renewed for any Renewal Term(s), the terms and conditions of this Agreement during each such Renewal Term are the same as the terms in effect immediately prior to such renewal.

**9.2.**    Termination. Either party may terminate this Agreement (a) for cause upon 30 days' written notice of a material breach to the other party, provided such breach remains uncured at the expiration of the notice period; or (b) for convenience upon 45 days written notice.

**9.3.**    Outstanding Fees. Termination shall not relieve Reseller of the obligation to pay any Fees accrued or payable to Confluent prior to the effective date of termination.

**9.4.**    Continuity. In the event that this Agreement is terminated, Confluent will continue to provide Products and Services to each End User of Reseller for the term of any outstanding agreement concerning provision of services that became effective before the expiration of this Agreement and for which Fees have been paid.

**9.5.**    Survival. The following Sections of this Agreement will survive the expiration and termination of this Agreement: Sections 1, 5, 6, 7.2, 8.2, 8.3, 9, 10, 11, 12, 13 and all payment obligations incurred prior to termination or expiration, as will any term(s) of this Agreement, or Exhibit to this Agreement that independently states that such term will survive. Expiration or termination this Agreement will not relieve either party of any already accrued obligation.

**10.    LIMITED LIABILITY.**

EXCEPT FOR A PARTY'S GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, OR BREACH OF CONFIDENTIALITY OBLIGATIONS OR INDEMNIFICATION OBLIGATIONS,

(A) IN NO EVENT WILL EITHER PARTY HAVE ANY LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY FOR ANY LOST PROFITS, BUSINESS, CONTRACTS, REVENUE, OR GOODWILL; COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; OR FOR ANY INDIRECT, SPECIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES HOWEVER CAUSED AND, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY WHETHER OR NOT THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE;

(B) IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY OR ANY THIRD PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER IN CONTRACT, TORT OR UNDER ANY OTHER THEORY OF LIABILITY, EXCEED THE AMOUNTS ACTUALLY PAID BY AND DUE FROM RESELLER UNDER THIS AGREEMENT DURING THE ONE YEAR PERIOD IMMEDIATELY PRECEDING THE DATE THE CAUSE OF ACTION AROSE. THIS LIMITATION SHALL APPLY EVEN IF THIS AGREEMENT OR ANY LIMITED REMEDY SPECIFIED HEREIN IS DEEMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE; AND

7

933\3518975.3

(C) IN NO EVENT WIL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY TO ANY THIRD PARTY ARISING OUT OF RELATED TO A PARTY'S INDEMNIFICATION OBLIGATIONS EXCEED ONE MILLION U.S. DOLLARS ($1,000,000).

## 11.    INDEMNIFICATION.

**11.1.**    Confluent. Confluent shall indemnify and hold Reseller harmless against any loss or damage arising out of a Confluent Claim (as defined below), and defend, or at its option, settle, any claim, demand, lawsuit or other action brought against Reseller by a third party (including but not limited to an End User) alleging that the act of reselling the Proprietary Software as authorized under this Agreement infringes the intellectual property rights of such third party, ("**Confluent Claims**"), including paying reasonable attorney fees and costs, and will pay a judgment or settlement awarded against Reseller in a Confluent Claim, provided that Reseller (i) promptly gives written notice of the Confluent Claim to Confluent; (ii) gives Confluent sole control of the defense and settlement of the Confluent Claim (provided that Confluent may not settle or defend any Confluent Claim unless it unconditionally releases Reseller of all liability); and (iii) provides to Confluent, at Confluent's cost, all reasonable assistance. Confluent will have no obligations to Reseller under this Section to the extent such Confluent Claims arise from (i) Reseller's selling of the Products in a manner contrary to the written instructions and documentation provided by Confluent to Reseller, (ii) from Reseller's combination of the Products with any products, services, hardware, or business processes not originating with and proprietary to Confluent if such infringement would not have arisen but for such combination, or (iii) Reseller Claims.   In the event of a Confluent Claim, Confluent shall at no additional charge to Reseller, and as Reseller's sole and exclusive remedy and as Confluent's sole and exclusive obligation: (i) promptly provide Reseller with substitute Products reasonably satisfactory to Reseller to replace those affected Products; (ii) repair or modify the affected Products to make them non-infringing or to fulfill Confluent's representation and warranty obligations to End Users; (iii) accept the return of the affected Products and refund to Reseller a pro rata portion of any fees paid by Reseller to Confluent for the remainder of all outstanding subscriptions granted to End Users.

**11.2.**    Reseller. Reseller shall defend, indemnify, and hold Confluent harmless against any loss or damage (including without limitation reasonable attorney's fees) incurred in connection with claims made or brought against Confluent by a third party (i) alleging that any product or service not offered by Confluent with which Reseller bundles the Products infringes the intellectual property rights of a third party, provided that Reseller knew that the bundling of any such product or service would necessarily result in the infringement of such third party's intellectual property rights, (ii) arising from a breach of section 13.10 (U.S. Foreign Corrupt Practices Act and Export Law Assurances), or (iii) arising from misleading or deceptive statements relating to the Products that are made by Reseller during its promotional and sales activities, except to the extent such statements are attributable to advertisements accepted by Confluent pursuant to Section 4, Confluent's published documentation, training materials, EULA, or marketing collateral provided by Confluent (collectively, "Reseller Claims"). Confluent will promptly give written notice of the Reseller Claim to Reseller; give Reseller sole control of the defense and settlement of the Reseller Claim (provided that Reseller may not settle or defend any Reseller Claim unless it unconditionally releases Confluent of all liability); and will provide to Reseller, at Reseller's cost, all reasonable assistance. Reseller will have no obligations to Confluent under this Section to the extent such Reseller Claims arise out of any Confluent Claims.

8

933\3518975.3

## 12.    CONFIDENTIALITY

**12.1.**    <u>Confidential Information</u>. Each party shall retain in confidence the non-public information and know-how disclosed or made available by the other party pursuant to this Agreement which is either designated in writing as proprietary and/or confidential, if disclosed in writing, or if disclosed orally, is designated in writing (which may be via email) as confidential within thirty (30) days of the oral disclosure or should reasonably be understood to be confidential by the recipient (the "<u>Confidential Information</u>). Notwithstanding any failure to so designate them, the Proprietary Software, Confluent's technology and technical information and the terms and conditions of this Agreement shall be Confluent's Confidential Information.

**12.2.**    <u>Nondisclosure</u>. Each party agrees to: (a) maintain the confidentiality of the other party's Confidential Information; (b) refrain from using the other party's Confidential Information except for the purpose of performing its obligations under this Agreement; and (c) not disclose such Confidential Information to any third party except to employees and subcontractors as is reasonably required in connection with the exercise of its rights and obligations under this Agreement (and only subject to binding written use and disclosure restrictions at least as protective as those set forth herein which the receiving party agrees to enforce)). Each party shall immediately notify the other party of any unauthorized disclosure or use of any Confidential Information and assist the other party in remedying such unauthorized use or disclosure by taking such steps as are reasonably requested by such other party.

**12.3.**    <u>Exceptions</u>. The foregoing obligations will not apply to Confidential Information of the other party which is: (i) already publicly known without breach of this Agreement; (ii) discovered or created by the receiving party without use of, or reference to, the Confidential Information of the disclosing party, as shown in records of the receiving party; or (iii) otherwise known to the receiving party through no wrongful conduct of the receiving party without a confidentiality obligation.  A disclosure by of any Confidential Information (a) in response to a valid  court order or other governmental body; (b) as otherwise required by law; or (c) necessary to establish the rights of either party under this Agreement shall not be considered to be a breach of this Agreement; provided that the receiving party shall provide prompt notice thereof and reasonable assistance to the disclosing party to enable the disclosing party to seek a protective order or otherwise prevent or restrict such disclosure. Moreover, either party hereto may disclose any Confidential Information hereunder to such party's agents, attorneys and other representatives (and only subject to confidentiality obligations at least as protective as those set forth herein which the receiving party agrees to enforce) or any court of competent jurisdiction as reasonably required to resolve any dispute between the parties hereto.

**12.4.**    <u>Personal Information</u>. Reseller agrees that it will:

   a)   comply with all applicable Privacy Laws pertaining to the Territory, including any instructions it provides to Confluent in relation to the collection, use or disclosure of Personal Information;

   b)   not, by any act or omission in connection with this Agreement, knowingly place Confluent in breach of any Privacy Laws pertaining to the Territory;

   c)   obtain all legally mandated consents from any individuals as are necessary to enable Confluent to collect, use and disclose the Personal Information of individuals for the purposes of performing its obligations under this Agreement.

9

933\3518975.3

**12.5.**  Remedies. Each party acknowledges that any breach or threatened breach of this Section may cause irreparable injury to the disclosing party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the disclosing party shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the receiving party, without the necessity of proving actual damages or posting any bond, in addition to any other rights or remedies provided by law.

## 13.  GENERAL PROVISIONS.

**13.1.**  Assignment. Neither party may assign or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, whether by operation of law or otherwise, to any third party without the other party's prior written consent. Any purported transfer, assignment or delegation without such prior written consent will be null and void and of no force or effect.  Notwithstanding the foregoing, each party shall have the right to assign this Agreement to any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise.  Subject to this Section, this Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

**13.2.**  Entire Agreement; Modification; Waiver. This Agreement, together with its exhibits, represents the entire agreement between the parties, and supersedes all prior agreements and understandings, written or oral, with respect to the matters covered by this Agreement, and is not intended to confer upon any third party any rights or remedies hereunder.  Reseller acknowledges that it has not entered in this Agreement based on any representations other than those contained herein.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing and signed by both parties.  If there is any conflict between the terms and conditions of this Agreement and the terms and conditions of any Reseller purchase order or other document, the terms and conditions of this Agreement shall prevail.  Any different or additional terms of any related purchase order or confirmation even if signed by the parties after the Effective Date shall have no force or effect unless it expressly amends a provision hereof.

**13.3.**  Waiver. The waiver of one breach or default or any delay in exercising any rights shall not constitute a waiver of any subsequent breach or default.

**13.4.**  Delays.  In the event that either party is prevented from performing or is unable to perform any of its obligations under this Agreement (other than any payment obligation) due to any Act of God, fire, casualty, flood, earthquake, war, strike, lockout, pandemic, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of the party invoking this Section, and if such party shall have used its commercially reasonable efforts to mitigate its effects, such party shall give prompt written notice to the other party, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences.

**13.5.**  Governing Law. This Agreement shall in all respects be governed by the laws of the State of California without reference to its principles of conflicts of laws.  The parties hereby agree that all disputes arising out of this Agreement shall be subject to the exclusive jurisdiction of and venue in the federal and state courts within Santa Clara County, California.  The parties hereby consent to the personal and exclusive jurisdiction and venue of these courts.  The parties hereby disclaim and exclude the application hereto of the United Nations Convention on Contracts for the International Sale of Goods.

**13.6.**  [INTENTIONALLY REMOVED]

10

933\3518975.3

13.7.    Severability. If any provision of this Agreement is held invalid or unenforceable under applicable law by a court of competent jurisdiction, it shall be replaced with the valid provision that most closely reflects the intent of the parties and the remaining provisions of the Agreement will remain in full force and effect.

13.8.    Relationship of the Parties.  Nothing in this Agreement is to be construed as creating an agency, partnership, or joint venture relationship between the parties hereto. Neither party shall have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever. Each party may identify the other as a customer or supplier, as applicable.

13.9.    Notices. All notices permitted or required under this Agreement shall be in writing and shall be deemed to have been given when delivered in person (including by overnight courier), or three (3) business days after being mailed by first class, registered or certified mail, postage prepaid, to the address of the party specified in this Agreement or such other address as is available through public records or as either party may specify in writing.

13.10.    U.S. Foreign Corrupt Practices Act and Export Law Assurances. Reseller represents and warrants that it shall comply with the U.S. Foreign Corrupt Practices Act and all applicable export laws, restrictions, and regulations of any United States or foreign agency or authority. Reseller understands that the Platform Software is subject to export control laws and regulations. NEITHER RESELLER NOR AN END USER MAY DOWNLOAD OR OTHERWISE EXPORT OR RE-EXPORT THE PLATFORM SOFTWARE OR ANY UNDERLYING INFORMATION OR TECHNOLOGY EXCEPT IN FULL COMPLIANCE WITH ALL APPLICABLE LAWS AND REGULATIONS, IN PARTICULAR, BUT WITHOUT LIMITATION, UNITED STATES EXPORT CONTROL LAWS. NONE OF THE PLATFORM SOFTWARE OR ANY UNDERLYING INFORMATION OR TECHNOLOGY MAY BE DOWNLOADED OR OTHERWISE EXPORTED OR RE- EXPORTED: (a) INTO (OR TO A NATIONAL OR RESIDENT OF) ANY COUNTRY TO WHICH THE UNITED STATES HAS EMBARGOED GOODS; OR (b) TO ANYONE ON THE U.S. TREASURY DEPARTMENT'S LIST OF SPECIALLY DESIGNATED NATIONALS OR THE U.S. COMMERCE DEPARTMENT'S LIST OF PROHIBITED COUNTRIES OR DEBARRED OR DENIED PERSONS OR ENTITIES. RESELLER HEREBY AGREES TO THE FOREGOING AND REPRESENTS AND WARRANTS THAT IT IS NOT AND ITS END USERS ARE NOT LOCATED IN, UNDER CONTROL OF, OR A NATIONAL OR RESIDENT OF ANY SUCH COUNTRY OR ON ANY SUCH LIST.

13.11.    Counterparts. This Agreement may be executed in counterparts, each of which is an original and all of which together shall be deemed to constitute one instrument.

13.12.    Costs. If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

13.13.    Construction. The titles and section headings used in this Agreement are for ease of reference only and shall not be used in the interpretation or construction of this Agreement. No rule of construction resolving any ambiguity in favor of the non-drafting party shall be applied hereto. The word "including", when used herein, is illustrative rather than exclusive and means "including, without limitation."

11

933\3518975.3

The persons signing below are the duly authorized representatives of each party.

| Confident, Inc. | Reseller |
|---|---|
| *Michael Poutre* | *Rikin Shah* |
| Signature | Signature |
| Michael Poutre | Rikin Shah |
| Printed Name | Printed Name |
| VP of Finance | CEO |
| Title | Title |
| 6/12/2020 \| 12:09 PM PDT | 6/12/2020 \| 11:54 AM PDT |
| Date | Date |

12

933\3518975.3

Intentionally Omitted

933\3518975.3

**Intentionally Omitted.**

933\3518975.3

# EXHIBIT B



**This Confluent Consulting and SI Partner Agreement** ("Agreement") is made by and between Confluent, Inc. and its Affiliates ("Confluent") with an office at 899 West Evelyn, Mountain View, CA 94041 and you. If you click on the "I agree", "I accept," or similar button to which this Agreement is attached or you use any benefits of the Confluent Partner Program, you agree that you and the organization on whose behalf you agree will be bound by the terms of this Agreement. If you are not authorized to bind your organization to this Agreement or do not agree to the terms of this Agreement, do not click on the "I agree", "I accept" or similar button. Confluent may reject this Agreement if it is determined, in Confluent's sole discretion, that you do not have the appropriate authority.

Confluent reserves the right to update this Agreement at any time by publishing the updated Agreement on the Confluent Website. By using the Confluent Website and participating in the Confluent Partner Program following such changes, you agree to the updated Agreement.

**BACKGROUND:**

Partner desires to provide consulting and advisory services for implementation projects in accordance with the requirements set forth in this Agreement, to acquire the right to use the Confluent Marks in connection with the sales and marketing of Confluent Products/ Services, and/or to receive the other benefits available under the Confluent Partner Program.

NOW, THEREFORE, in consideration of the mutual obligations in this Agreement, the Parties agree as follows:

**1.      DEFINITIONS**

"Affiliate" means any entity that controls, is under common control with, or is controlled by Confluent or Partner, where "control" means the ownership, direct or indirect, of a majority of an entity's stock entitled to vote for the election of directors.

"Confluent API/ SDK" means Confluent's software development kits and/or application program interface software, including updates, bug fixes, or error corrections or other minor enhancements that Confluent may issue from time to time in its sole discretion. Use of the Confluent API/SDK by Partner will assist with the enablement of interoperability between the Products and the Confluent Products.

"Confluent Marks" means Confluent´s trade names, trademarks, service marks, and logos.

"Confluent Partner Program" means the program under this Agreement described in the Cofluent Partner Program Guide on the Confluent Website.

"Confluent Product(s)/Service(s)" means the Confluent technology for which Partner is providing consulting and advisory services.



"Confluent Trademark Guidelines" are Confluent's trademark guidelines found at https://www.confluent.io/confluent-trademark-guidelines/, which are incorporated into this Agreement by reference and may be updated from time to time.

"Confluent Website" means the web pages that Confluent generally makes available for its Confluent Partner Program, as may be updated from time to time.

"Device" means, if applicable, Partner's hardware and/or Products/Services other than the Software.

"Marketing Collateral" means sales and marketing materials including brochures, banners, presentations, compatibility catalogue, and all other advertising materials used to promote the Products/Services or Partner's business.

"Partner," "you," or "your" means collectively you and the organization you represent that registers for and is accepted into the Confluent Partner Program and accepts this Agreement.

"Partner Materials" means information about Partner and Products/Services that are provided by Partner to Confluent.

"Partner Program Guide" means the additional information about the Partner Program that Confluent makes available to Partner via the Confluent Website, as may be updated from time to time.

"Party" and "Parties" mean Partner and/or Confluent, as the context requires

"Registered Partner" means a Confluent Partner participating in the Confluent Partner Program at the Registered program level, as more fully described in the Partner Program Guide.

"Plus Partner" means a Confluent Partner participating in the Confluent Partner Program at the Plus program level, as more fully described in the Partner Program Guide.

"Preferred Partner" means a Confluent Partner participating in the Confluent Partner Program at the Preferred program level, as more fully described in the Partner Program Guide.

"Premiere Partner" means a Confluent Partner participating in the Confluent Partner Program at the Premiere program level, as more fully described in the Partner Program Guide.

"Privacy Policy" means Confluent's Privacy Policy set forth at https://www.confluent.io/privacy/ as may be updated from time to time.

"Product(s)/Service(s)" means the Partner Services, Applications, Software, Devices, and/or Solutions as the context may require, including manuals and other related documentation, which can be used in connection with Confluent Products/Services and which have been approved for use in connection with the Confluent Marks.



"Software" means Partner's software Products/Services, which may consist of one or more software components or applications, as well as associated documentation for use with the Software, such as user manuals.

"Solution" means Partner application(s) and Devices used to host "Software as a Service" ("SaaS") to allow access to such applications by Partner's customers.

"Terms of Use" means Confluent's Terms of Use set forth at https://www.confluent.io/terms-of-use/ as may be updated from time to time.

"Updated Versions" means any modifications, adaptations, customizations, fixes, enhancements, and new releases.

"Virus" means: (i) any program code, programming instruction or set of instructions intentionally constructed with the ability to damage, interfere with or otherwise adversely affect computer programs, data files or operations; or (ii) any other code typically designated to be a virus.

## 2.    PROGRAM REQUIREMENTS AND APPROVAL BY CONFLUENT

Partner shall become a member of the Confluent Partner Program and receive the benefits as specified in the Partner Program Guide on the Confluent Website and any other rights contemplated by this Agreement if Partner meets the following requirements: (i) Partner successfully completes and submits the online registration application; (ii) Partner successfully completes the Foreign Corrupt Practices Act diligence as may be requested at Confluent's sole discretion and meets any followup requirements as Confluent may require; (iii) Confluent's notification to you that you have been approved to participate in the Partner Program; (iv) Confluent's assignment of you to a specific Partner type and Partner tier; (v) Partner's demonstrated compliance with all Confluent Partner Program requirements as set forth on the Confluent Website; and (vi) if applicable, Partner complies with all requirements for its Software as determined by Confluent, including but not limited to Partner's acceptance of Confluent's Terms of Use and Privacy Policy. If the requirements set forth herein have not been met, or if Partner fails to complete updated versions of the Foreign Corrupt Practices Act diligence as may be updated from time to time at Confluent's sole discretion, Partner shall not be eligible to participate in the Confluent Partner Program and/or to publish any Application to the Confluent Website, including receiving the applicable benefits and licensing rights under this Agreement.

## 3.    CONFLUENT PARTNER PROGRAM & LICENSE GRANT

3.1     Subject to the terms and conditions of this Agreement, during the term of this Agreement Partner shall have membership in the Confluent Partner Program and agrees to the applicable program requirements, as they may be updated from time to time in Confluent's sole discretion. Likewise, Confluent undertakes the obligations to Partner as set forth in this Agreement.



3.2    Subject to the terms and conditions of this Agreement and Confluent TrademarkGuidelines in effect during the term of this Agreement, Partner is hereby granted a non-sublicensable, non-transferable, non-exclusive right to identify itself as a Confluent Partner and to use the Confluent Marks in accordance with this Agreement. Confluent is also hereby granted the right to identify Partner in the same manner. There are different levels of Confluent Partner members, as described on the Confluent Website. In Partner's completed application, Partner shall indicate its desired level of membership, to be ultimately determined and designated by Confluent in its sole discretion.

**4.      CONFLUENT PARTNER LOGO & PARTNER TRADEMARKS**

4.1    Partner shall not change, modify, or distort the Confluent Marks.

4.2    Partner may only use the Confluent Marks on Marketing Collateral and on the Partner's website to acknowledge membership within the Confluent Partner Program. The license granted by Confluent under Section 3 is expressly conditioned on the requirement that Partner complies with any and all applicable laws and regulations pertaining to Partner's preparation, use, and distribution of the Products/Services and all documentation, packaging, and Marketing Collateral.

4.3    When using any and all materials bearing the Confluent Marks, Partner shall abide by the then-current Confluent Trademark Guidelines which may be updated from time to time at Confluent's sole discretion. Partner shall send all materials that propose to incorporate Confluent Marks to Confluent's designated contact person for approval in advance of any public use. Confluent's approval will not to be unreasonably denied, conditioned, withheld, or delayed. All materials including the Confluent Marks must in-clude the name, address, and telephone number for Partner and must identify Partner as the manufacturer of the Products/Services or service provider. Partner shall include the appropriate attributions as required by the Confluent Trademark Guidelines any time Partner uses the Confluent Marks on the Products/Services, Marketing Collateral, packaging, Partner's website, and any other materials related to the Products/Services.

4.4    Partner acknowledges Confluent's ownership and title to the Confluent Marks, and that all Confluent Marks will remain the exclusive property of Confluent, notwithstanding whether Confluent owns the right to these Confluent Marks by registration or otherwise. Partner shall not register, or attempt to regis-ter, in any country in the world, any Confluent Marks or other trademarks, service marks or logos reasonably deemed by Confluent, in its sole discretion, to be confusingly similar to existing Confluent Marks. This Agreement shall not in any manner limit Confluent's right to use, otherwise exploit, or further license the Confluent Marks.

4.5    Partner acknowledges that the Confluent Marks have gained reputation and goodwill and the Confluent Marks and other intellectual property rights of Confluent present a great value for Confluent. In order to maintain the standards which are essential for protecting the value of the Confluent Marks and other intellectual property rights, Partner's use and the use by Partner's customers of the Confluent Marks shall at all times comply with this Agreement and shall not in any manner adversely affect the Confluent Marks and/or other intellectual property rights of



Confluent. Partner agrees that it will neither make nor authorize any use of the Confluent Marks in any manner or on any material, or in connection with any Products/Services and/or Application, that is disparaging, pornographic, violent, obscene, indecent, unlawful, derogatory, defamatory, libelous, threatening, harassing, contrary to public policy or applicable law, statute, rule or regulation, and shall not use the Confluent Marks in any manner that diminishes or otherwise damages Confluent's goodwill in the Confluent Marks.

4.6     Confluent may modify the Confluent Marks at any time in its sole discretion. Confluent shall inform Partner of any modification of the Confluent Marks, and Partner shall cease using the old Confluent Marks and shall use only the modified Confluent Marks no later than three (3) months from the date of such notification, unless expressly provided otherwise in a written agreement between Confluent and Partner.

4.7     Except for the uses specifically permitted under Section 4.2 of this Agreement, Partner must receive Confluent's written consent prior to using the Confluent name and/or Confluent Marks, in any (i) internal or external market facing communications and/or listings; (ii) in any other type of publicity, including but not limited to press releases, marketing materials, and presentations (whether oral or written); and (iii) in any oral or written material including an endorsement or quote by Confluent.

## 5.    OBLIGATIONS OF PARTNER RELATING TO THE PRODUCTS/SERVICES & CONFLUENT WARRANTY DISCLAIMER

5.1     Partner shall bear all the costs related to the Products/Services, including, without limitation, any costs relating to the Marketing Collateral and the packaging of the Products/ Services and/or publication of the Products/ Services. The quality of the Products/Services marketed, sold, or oth-erwise distributed with the Confluent Marks shall always be of equal or higher quality than the quality of the Products/Services samples that may be tested and ap-proved in accordance with this Agreement, and development and manufacturing of the Products/Services shall take place in compliance with no less than industry standard development and manufacturing practices.

5.2     Partner shall provide an industry standard warranty for the Products/Services. Partner's warranty terms for the Products/Services shall fully comply with all applicable laws, orders, rules and/or regulations, as well as with any customary recommendation and normal business practices in any country where the Products/ Services is sold or marketed. Partner's membership under the Confluent Partner Program, including the right to use the Confluent Marks as specifically permitted under this Agreement, shall in no way be construed as Confluent giving Partner, its customers, or others a warranty, representation, or assurances in relation to any part or function of the Products/Services whatsoever, and therefore, Partner shall assume sole liability for the Products/Services and shall in no way expressly state or otherwise imply in any manner any such warranty, representation, or assurance on behalf of Confluent.



5.3     Partner represents and warrants that: (a) Partner holds all rights in or has appropriate licenses for (including without limitation any copyright, trademark, patent, publicity or other rights) any Partner Materials and Products/Services, and is in compliance with all such licenses; (b) all Partner account information provided to Confluent is complete, correct and current; (c) any use of any Partner Materials and Products/Services hereunder will not violate or encourage violation of any applicable laws, regulations, code of conduct, or third party rights (including without limitation intellectual property rights and privacy right); (d) Partner Materials or Products/Services provided to Confluent do not include disparaging, pornographic, violent, obscene, indecent, derogatory, defamatory, libelous, threatening, harassing material or material that is contrary to public policy; (e) Partner Materials and Products/Services will not include illegal or fraudulent advertisements or promote illegal or fraudulent business practices; (f) Partner shall not use any automated means or form of mirroring to access, query, or otherwise collect traffic from any webpage or property except as expressly permitted by Confluent hereunder; and (g) Partner shall notify Confluent immediately of any unauthorized use of any password or account or any other known or suspected breach of security.

5.4     TO THE EXTENT PERMITTED BY APPLICABLE LAW, CONFLUENT SPECIFICALLY DISCLAIMS ANY EXPRESS, IMPLIED OR STATUTORY WAR-RANTY, INCLUDING BUT NOT LIMITED TO ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PAR-TICULAR PURPOSE, OR NON-INFRINGEMENT FOR ANY CONFLUENT MARKS, CONFLUENT PRODUCTS/SERVICES (INCLUDING THE CONFLUENT API/SDK), TEST RESULTS, TESTING KITS, CONFLUENT WEBSITE AND CONTENT CONTAINED THEREIN, OR ANY OTHER MATERIALS, SERVICES, OR INFORMATION PROVIDED BY CONFLUENT. CONFLUENT MAKES NO REPRESENTATIONS, WARRANTIES OR OTHER ASSURANCES IN RELATION TO ANY PART OR FUNCTION OF THE PRODUCTS/SERVICES AND/OR APPLICATION. CONFLUENT MAKES NO WARRANTIES UNDER THIS AGREEMENT TO ANY THIRD PARTY, INCLUDING, WITHOUT LIMITATION, PARTNER'S CUSTOMERS.

5.5     Partner shall provide all necessary installation, operation, and maintenance services (including technical support services and the provision of Products/ Services updates), directly to its customers for the Products/Services, specifically including handling all tier 1 and tier 2 issues with Partner's customers, pursuant to any applicable Partner support policies or support agreements.

5.6     Partner shall exercise commercially reasonable efforts to ensure that no Viruses are coded, introduced, or inserted into the Products/Services and/or any Confluent Products/ Services, which would have the effect of disabling, damaging, erasing, delaying, or otherwise shutting down all or any portion of the Products/ Services, the Confluent Products/ Services, or the Confluent Website. Partner agrees that, in the event that a Virus is found to have been coded, introduced or inserted into the Products/ Services, any Confluent Products/ Services, or the Confluent Website via a Products/Services or the Partner Materials, Partner shall, at its expense, eliminate the effects of the Virus.

## 6.     PAYMENTS, FEES AND INSURANCE



6.1     If Partner is a Plus Partner, Preferred Partner or a Premier Partner, Partner agrees to pay during the Term of this Agreement the annual fees and taxes as may be established by Confluent. Partner agrees to make such payments within thirty (30) days from the date of Confluent's invoice. All fees and taxes paid under this Agreement are non-refundable.

6.2     Partner shall maintain in effect during the Term of this Agreement and during any applicable warranty period of the Products/Services, at Partner's expense, comprehensive property, public Products/Services liability (including physical damage and recall), and general liability insurance of the types and amounts and covering such risks as are reasonable and customary for businesses engaged in a similar business as Partner, and further levels of coverage as may be reasonably requested by Confluent. Such insurance coverage will be obtained from reputable insurance companies or associations. Upon the request of Confluent, Partner shall provide copies of valid certificates of insurance to Confluent.

6.3     Subject to completing and maintaining all requirements of this Agreement, including but not limited to those in Section 2 and Section 11 of this Agreement, as a Confluent Consulting and SI Partner, you will receive a one-time market development fund (MDF) credit of 5% of the net revenue actually received by Confluent from a Qualified Referral (defined below) for a Confluent Platform Subscription (Confluent Platform) and Confluent Cloud Service (Enterprise Version) with an annual Subscription. Confluent will pay the MDF Credit into Partner's market development account after completion of the sale (a, "Booking") for the specific Qualified Referral. Should the Qualified Referral not pay the required fees to Confluent within 30 days of Booking, Confluent may either seek repayment of the MDF credit from Partner or issue a debit against Partner's MDF.  Partner agrees that (a) it shall use all MDF Credits only for Confluent qualified and approved services in accordance with the MDF Guideline document, and (b) any unused MDF Credits expire without refund or other cash payment after 'one' year from the date of deposit. "Qualified Referrals" are specific opportunities sourced by Partner and approved by Confluent based on a specific referral. Confluent retains the right to reject any referral in its sole discretion. Without limiting that discretion, please note that Confluent will not approve a referral if: (i) the referred customer is, prior to the time of submission by Partner, a user of any Confluent Products; or (ii) the referred customer has previously discussed with Confluent (or with any of our Affiliates, resellers, or other channel partners) the possibility of entering into an agreement for the provision of any Confluent Products/Services. In addition, Partners providing services for Confluent are not eligible to receive an MDF Credit for an opportunity for which they will serve as the subcontractor.

## 7.     LIMITATION OF LIABILITY

7.1     Confluent shall have no liability for delays, interruptions or errors in the Partner Materials, Products/Services, the Confluent Website, whether or not formatted by Confluent, nor for errors in references to or links to or from webpage(s) (such as in search terms, headings, Partner indices, Products/Services indices, or electronic or uniform resource locator links). Confluent shall make corrections on the Confluent Website and/or links about which it is aware and over which it

CONFLUENT

has control in a commercially reasonable time and fashion. Confluent is not in any way responsible for the subsequent use or misuse by end users who may access Partner Materials.

7.2    TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, UNDER NO CIRCUMSTANCES SHALL CONFLUENT, ITS EMPLOYEES, OFFICERS, DIRECTORS, AFFILIATES, ASSIGNS, LICENSORS OR SUPPLIERS, BE LIABLE FOR ANY COSTS OF PROCUREMENT OF SUBSTITUTE GOODS, LOST PROFITS, LOST REVENUES OR DATA, COSTS ASSOCIATED WITH THE INTERRUPTION OF BUSINESS, OR FOR ANY OTHER SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES, HOWSOEVER CAUSED, WHETHER FOR BREACH OF WARRANTY, CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EVEN IF CONFLUENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE TOTAL DIRECT LIABILITY OF CONFLUENT ARISING OUT OF THIS AGREEMENT AND/OR THE TERMINATION THEREOF SHALL BE LIMITED TO LESSER OF THE AMOUNT PAID BY YOU UNDER THE AGREEMENT IN THE SIX (6) MONTHS IMMEDIATELY PRECEDING THE CLAIM OR $10,000 USD. THESE LIMITATIONS WILL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY PROVIDED HEREIN. CONFLUENT'S LIMITATION OF LIABILITY IS CUMULATIVE, WITH ALL CONFLUENT'S EXPENDITURES BEING AGGREGATED TO DETERMINE SATISFACTION OF THE LIMIT. THE EXISTENCE OF MULTIPLE CLAIMS OR SUITS WILL NOT ENLARGE OR EXTEND THE LIMIT.

## 8.    INFRINGEMENTS

8.1    Partner shall promptly notify Confluent in writing of: (1) any infringement of the Confluent Marks by third parties of which the Partner becomes aware, or (2) any claims that the Confluent Marks infringe any third-party intellectual property rights. Confluent shall have the exclusive right to determine whether or not any actions shall be taken on account of any such claims. If re-quested by Confluent, Partner shall undertake all reasonable measures, at Confluent's expense, in order to assist Confluent in any such actions. Partner shall not institute any suit or take any legal action on account of any such claims.

8.2    Partner agrees, at its own expense, to defend, indemnify and hold Confluent and its Affiliates harmless against any third party action brought against Confluent arising from or related to: (a) a failure by Partner to comply with the terms of this Agreement and any other agreement the parties may enter into, the requirements of law, or its customers expectations as pertaining to the Partner Materials and Products/Services; (b) actual or alleged infringement or misappropriation of the Partner Materials or Products/Services of any copyright, patent, trade secret or other intellectual property rights or similar rights of any third party; or (c) any loss, property damage or damage to person caused by the Partner Materials or Products/Services.

## 9.    TERM AND TERMINATION

Confluent Consulting and SI Partner Agreement           8           v. 5.19.20



9.1    The effective date of this Agreement shall be the date this Agreement is electronically accepted by Partner ("Effective Date").  From the Effective Date, this Agreement shall continue for three (3) years ("Term"). If Partner desires to renew this Agreement, Partner must re-register at the Confluent Website. In order to assure the term of this Agreement continues without lapse, registration should be completed before the end of each Term.  Further, any material changes to this Agreement by Confluent will require Partner to agree to a new agreement.

9.2    If  Products/Services marketed in connection with the Confluent Marks are not in conformity with any of Partner's obligations hereunder, Confluent shall give Partner written notice thereof and Partner shall immediately remedy any non-conformity. If such non-conformities are not immediately remedied, Partner shall (a) discontinue use of the Confluent Marks in connection with the non-conforming Products/Services, (b) discontinue all use of associated Marketing Collateral, and s (c) destroy all such materials containing the Confluent Marks.

9.3    Either Party may terminate this Agreement at any time without cause upon thirty (30) days prior written notice.

9.4    This Agreement may be terminated with immediate effect by written notice by either Party in the event that: (i) the other Party commits a breach of any of its obligations, warranties or assurances under this Agreement or the terms, guidelines or criteria of this Agreement and fails to remedy such breach within ten (10) days after having been given written notice in respect thereof; or (ii) the other Party causes complaints among  customers or third parties which the non-defaulting Party reasonably determines as harmful to its reputation, goodwill, business or value of its intellectual property rights.

9.5    This Agreement shall automatically terminate without further notice if either Party: (i) is involved in any proceedings under any bankruptcy or other insolvency laws, or laws for the relief of debtors; (ii) has a receiver or other court appointee named for its business or property; (iii) makes an assignment for the bene-fit of creditors; (iv) is unable or fails to make payments as they become due; or (v) is liquidated, dissolved or its existence is terminated.

9.6    This Agreement may be terminated with immediate effect by written notice by Confluent in the event that: (a) there is a merger or acquisition of all or substantially all of Partner's assets; (b) there is a direct or indirect change of ownership of Partner;  (c) any agreement is entered into whereby control over all or a substantial portion of Partner's operations or assets passes or will pass into the hands of an undertaking that is in competition with Confluent; or (d) there is a violation of the nondisclosure obligations as set forth under Section 10.

9.7    Upon termination of this Agreement, Partner's right to use the Confluent Marks shall expire, and Partner shall immediately remove the Confluent Marks from the Products/Services, Marketing Collateral and from Partner's website, and Partner shall destroy all such materials containing the Confluent Marks.Furthere, Confluent reserves the right to immediately remove (and destroy, as applicable) Partner Materials from the Confluent Website. Upon Confluent's request, Partner shall certify in writing to Confluent that it no longer uses or has any rights to use the Confluent Marks.



9.8    Upon termination of this Agreement, neither party shall be liable to the other, because of such termination, for compensation, reimbursement or damages on account of the loss of prospective profits or anticipated sales or on account of expenditures, inventory, investments, leases or commitments in connection with the business or goodwill of Confluent or Partner. Except as expressly stated otherwise in this Agreement, termination shall not relieve either party of obligations incurred prior to the termination.

## 10.    Confidentiality

10.1    "Confidential Information" means information that (a) is marked clearly as confidential or proprietary; (b) is designated as confidential or proprietary at the time of disclosure; or (c) by its nature, the receiving party ("Recipient") knows or a reasonable person would consider to be confidential, including the terms of this Agreement and the existence of discussions between the Parties. Confidential Information includes information (whether disclosed verbally, in documentary form, by demonstration or otherwise) relating to the disclosing party's  ("Discloser") business (including, without limitation, computer programs, technical drawings, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial, customer and Products/ Services development plans, road-maps, forecasts, strategies and information).

10.2    Recipient shall maintain the Confidential Information in confidence and disclose the Confidential Information only to its employees, subcontractors and consultants who have a need to know such Confidential Information in order to fulfill obligations of Recipient as set forth in this Agreement. Recipient shall first have entered into a confidentiality agreement with such employees, subcontractors, and consultants at least as restrictive as this Agreement. Recipient remains responsible for breaches of this Agreement arising from the acts of its employees, subcontractors, and consultants. Confidential Information is to be used only for the purposes of this Agreement.

10.3    Recipient's duty to protect Confidential Information expires three (3) years from the date of receipt of the Confidential Information. Recipient shall protect the Confidential Information by using the same degree of care as Recipient uses to protect its own information of a like nature, but no less than a reasonable degree of care, to prevent the unauthorized use, disclosure, dissemination, or publication of the Confidential Information. Recipient shall promptly return or certify destruction of all copies of Confidential Information upon request by the other party or upon the expiration or earlier termination of this Agreement.

10.4    This Section imposes no obligation upon Recipient with respect to Confidential Information that: (a) was rightfully in Recipient's possession before receipt fromDiscloser; (b) is or becomes a matter of public knowledge through no fault of Recipient; (c) is rightfully received by Recipient from a third party without a duty of confidentiality; (d) is disclosed by Discloser to a third party without a duty of confidentiality; (e) is independently developed by Recipient without use or reference to Discloser's Confidential Information; or (f) is disclosed by Recipient with Discloser's prior written approval. If Recipient is confronted with legal action to disclose Confidential

Confluent Consulting and SI Partner Agreement          10          v. 5.19.20



Information received under this Agreement, Recipient shall promptly notify Discloser, and reasonably assist Discloser, at Discloser's expense, in obtaining a protective order requiring that any portion of the Confidential Information required to be disclosed be used only for the purpose for which a court issues an order, or for such other purposes as required by law.

10.5    ANY CONFIDENTIAL INFORMATION EXCHANGED UNDER THIS AGREEMENT IS PROVIDED "AS IS" WITHOUT WARRANTY OF ANY KIND.


**11.    Anti-Bribery and U.S. Foreign Corrupt Practices Act**

11.1    <u>Compliance with Laws</u>.  Partner represents, warrants, and covenants that it will comply with all applicable legal requirements in the course of performing its obligations under this Agreement.

11.2    <u>Anti-Corruption Compliance</u>.  Without limiting the generality of Section 11.1, Partner represents, warrants, and covenants that in performing its obligations under this Agreement, it will not, directly or indirectly, offer, give, promise, or authorize the offering, giving, or promising of, anything of value to a Covered Person (as defined below) to induce the Covered Person to take or refrain from taking any action in an improper manner, or improperly using their influence with others, for the purpose of assisting Confluent to obtain or retain business, direct business to any other person, or gain any improper advantage.

The term "Covered Person" means any of the following:

(a)        an officer, employee, agent or representative of any government, including any department, agency, or subdivision thereof;

(b)        an officer, employee, agent, or representative of any public international organization (such as the United Nations, the World Bank, or a regional development bank);

(c)        an officer, director, employee, agent, or representative of a company owned or controlled, in whole or in part, by any government;

(d)        a political party, an official of a political party, or a candidate for political office;

(e)        a member of a royal or ruling family;

(f)        any person acting in an official a capacity on behalf of any of the foregoing;

(g)        any person at a private sector company in a position to award business or other benefits to Confluent; and



(h)                    any close family relative of any of the persons listed above.

11.3    Periodic Certifications.  When requested to do so by Confluent during the term of this Agreement (but not more frequently than semi-annually), Partner shall promptly provide written certifications, signed by a duly authorized member of Partner's management, confirming Partner's understanding of, and continued compliance with, the requirements set forth in Section 11.2.

11.4    Periodic Reports.  Partner shall provide Confluent with detailed written reports describing the services rendered to Confluent under this Agreement.  Such reports shall identify all Partner personnel who rendered services to Confluent, the Covered Persons with whom Partner personnel met, and such other information as Confluent may reasonably request from time to time.  Partner shall submit such reports to Confluent on a  calendar quarterly basis for the previous 3 months period quarter ("Previous Quarter") throughout  the Term, no later than fourteen (14) days following the end of the Previous Quarter.  Confluent may, in its discretion, furnish Partner with forms for use in the preparation and submission of such reports.

11.5    Training.  Partner shall cause its management, and all of its personnel who will be involved in rendering services to Confluent under this Agreement, to undergo training once in every twelve (12) month period that addresses Partner's compliance obligations under Section 11.2.  The form and substance of such training shall be not less than that commensurate with the Foreign Corrupt Practices Act 1977 (US), the Bribery Act 2010 (UK ), and local anti-bribery and anti-corruption laws in the countries in which Partner carries on business.

11.6    Gifts and Hospitality.  In the course of performing its obligations under this Agreement, Partner shall not offer, give, promise, or authorize the offering, giving, or promising of, any gifts, hospitality, meals, travel, lodging, or entertainment to a Covered Person without the prior written consent of Confluent, which Confluent may withhold in its sole discretion.

11.7    Facilitation Payments.  In the course of performing its obligations under this Agreement, Partner shall not offer, give, or promise, or authorize the offering, giving, or promising of, anything of value to a Covered Person in order to expedite or secure the performance of any routine or administrative governmental action, even if a delay in securing such governmental action may cause Partner or Confluent inconvenience or disruption to their respective business activities.

11.8    Termination.  In addition to Confluent's  termination rights elsewhere under this Agreement, Confluent shall have the right in its sole discretion to immediately terminate this Agreement in the event that Confluent reasonably believes that Partner has breached the provisions of Sections 14.1 or 14.2, or that a breach of such provisions is imminent.  In such circumstances, Confluent shall have no further liability to Partner under this Agreement.

11.9    Current and Continued Compliance. Confluent may require Partner to successfully complete Confluent's Foreign Corrupt Practices Act diligence process prior to becoming a Partner

or at any point during the term of this Agreement. Should Partner not complete such request(s) to Confluent's satisfaction, Confluent may revoke Partner's application or Partner status at any time.

## 12.    CHANGES

12.1    Confluent Partner Program. Confluent may modify the Confluent Partner Program (including the details set forth in the Program Guide and the Trademark Guidelines) at any time by posting such modifications on the Confluent Website without any liability to you or to any third parties. Confluent may also suspend or terminate the Partner Program or your participation in the Partner Program at any time with no liability to you or to any third parties, in which case we will notify you of such suspension or termination by writing to you at the email address you provided to us.

12.2    Agreement. We may amend this Agreement from time to time. We will provide you with advance notice of any material amendments. This notice will be provided via the email address of the primary account contact that you provided to us. The amended version of the Agreement will become effective on the effective date noted in the email ("Amended Date"). You may notify us that you do not agree to the amended version, as detailed below.

For other amendments, the updated Agreement will be posted on the Confluent Partner section of our website with the effective date (also, an "Amended Date"). Confluent encourages you to check the Amended Date of the Agreement whenever you visit the Confluent Website. Absence of direct notification to you does not affect such amendment's enforceability.

12.3    If you do not agree to the amended version of the Agreement, you must notify us by writing to us at partners@confluent.io within thirty (30) days of the Amended Date, whereupon the Agreement between Confluent and you will terminate as of the date of such notification unless the parties agree otherwise in writing prior to the thirty-first (31st) day.

12.4    All amended Agreements will supersede prior Agreements. You acknowledge and agree that by continuing to participate in the Confluent Partner Program after the Amended Date, you agree to be bound by the amended Agreement.

12.5    Your Responsibility. You are solely responsible for monitoring the Confluent Partner section of the ConfluentWebsite for any changes to this Agreement. Absence of direct notification to you does not affect such modifications' enforceability.

## 13. GENERAL

13.1    Neither this Agreement, nor any terms and conditions contained herein, shall be construed as creating a partnership, joint venture, franchise or agency relationship between Confluent and



Partner. Partner agrees that it shall inform its customers that Partner is an independent business from Confluent, and shall not hold itself out as an agent of Confluent, or attempt to bind Confluent to any third-party agreement. Partner shall inform its customers in its Marketing Collateral and through its sales process that use of Confluent Products/Services are subject to the terms of the customers' licenses and/or service agreements with Confluent.

13.2    If a particular provision of this Agreement is terminated or held by a court of competent jurisdiction to be invalid, illegal, or unenforceable, this Agreement shall remain in full force and effect as to the remaining provisions.

13.3    No waiver of any breach of any provision of this Agreement shall constitute a waiver of any prior, concurrent, or subsequent breach of the same or any other provisions hereof, and no waiver shall be effective unless made in writing and signed by an authorized representative of the waving Party.

13.4    The terms of any other documents or electronic communications exchanged (including the terms set forth on any purchase order) shall be of no force or effect.

13.5    Both parties agree to comply with applicable US or other export and import laws and regulations.  Under no circumstances may the material and/or information provided under this Agreement be exported to any country subject to US embargo or to US-designated denied persons or prohibited entities or U.S. specially designated nationals.

13.6    Any notice required or permitted by this Agreement will be in writing and will be sent by prepaid registered or certified mail, return receipt requested, or overnight courier, charges prepaid, to the applicable address set forth herein, or to such other address for which the relevant party gives appropriate notice. Notice shall be deemed given when delivered or if by fault of the addressee delivery is not accomplished, when sent. Notices to Confluent shall be given to Confluent Inc., 899 West Evelyn, Mountain View, CA 94041, Attn: General Counsel.  Notices to Partner shall be given to the address specified in Partner's accepted application, to the attention of the General Counsel.

13.7     The section headings used in this Agreement shall be intended for convenience only and shall not be deemed to supersede or modify any provisions.

13.8    The making, execution and delivery of this Agreement have been induced by no representations, statements, warranties, or agreements other than those herein expressed. Both parties represent that they have the legal authority to bind their respective organizations to this Agreement.

13.9    This Agreement and any rights or obligations hereunder shall not be assigned or sublicensed by Partner without prior written consent from Confluent.  Confluent may assign this Agreement to its Affiliates or an entity that merges into or acquires all or substantially all of Confluent's assets, or in connection with a sale of stock, reorganization or otherwise. Any attempted assignment or transfer in violation of the foregoing shall be void and shall result in the

# ✳ CONFLUENT

immediate and automatic termination of this Agreement. Subject to this restriction, this Agreement will be binding upon and inure to the benefit of the Parties and their successors and assigns.

13.10  Governing Law and Jurisdiction. The rights and obligations of the parties and all interpretations and performance of this Agreement shall be governed by and construed in accordance with the laws of California, USA, without regard to conflicts of laws principles. The Parties agree that the provisions of the United Nations Convention on Contracts for the International Sale of Goods do not apply to this Agreement. The Parties irrevocably and unconditionally consent to the exclusive jurisdiction of the courts of Santa Clara County, California, USA, and all courts competent to hear appeals therefrom. THE PARTIES WAIVE ANY RIGHT TO JURY TRIAL IN CONNECTION WITH ANY ACTION OR LITIGATION IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT.

13.11    Force Majeure. Neither Party will be liable to the other for any failure or delay in performance by circumstances beyond its control, including but not limited to, acts of God, fire, labor difficulties, pandemic, governmental action, or terrorism, provided that the Party seeking to rely on such circumstances gives written notice of such circumstances to the other Party and uses reasonable efforts to overcome such circumstances.

13.12  This Agreement, including the Confluent Partner Program requirements as set forth on the Confluent Website, constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous communications, including all prior and current Partner agreements.

# EXHIBIT C



# Invoice

**899 West Evelyn
Mountain View CA 94041
United States**

| | |
|---|---|
| **Date** | 8/31/2023 |
| **Invoice#** | INV25311 |
| **Terms** | Net 60 |
| **PO Number** | 82000 |
| **Due Date** | 10/30/2023 |
| **Currency** | US Dollar |

**Bill To**

Slower, LLC
3200 Park Center Drive, Suite #400
Ste #1400
Costa Mesa  CA  92626
United States

**Ship To**



| Item | Description | Sub Start Date | Sub End Date | Net Amount |
|---|---|---|---|---|
| Confluent Platform Platinum Development Node | | 9/7/2021 | 9/6/2024 | $0.00 |
| Confluent Platform Platinum Production Node | | 9/7/2021 | 9/6/2024 | $624,000.00 |

| | |
|---|---|
| **Subtotal** | $624,000.00 |
| **Tax Total** | $0.00 |
| **Total** | **$624,000.00** |

For Canada Only:
GST/ HST Number: ▮▮▮▮▮▮▮▮
QST Number: ▮▮▮▮▮▮

Bank Name: JPMorgan Chase
Bank Address: JPMorgan Chase New York, NY 10017

For ACH delivery:
Bank Routing Number: ▮▮▮▮▮
Account Number: ▮▮▮▮▮▮
Account Name: Confluent, Inc. – Receivables Account

For Wire Transfers:
Bank Routing Number: ▮▮▮▮▮
Swift Code: ▮▮▮▮▮
Bank Reference Address: JPMorgan Chase New York, NY 10017
Account Number: ▮▮▮▮▮
Account Name: Confluent, Inc. – Receivables Account

INV25311

1 of 1

# EXHIBIT D



# Invoice

| | |
|---|---|
| **Date** | 4/1/2024 |
| **Invoice#** | INV33042 |
| **Terms** | Net 60 |
| **PO Number** | 242940 |
| **Due Date** | 5/31/2024 |
| **Currency** | US Dollar |



**899 West Evelyn**
**Mountain View CA 94041**
**United States**

| **Bill To** |
|---|
| Slower |
| Attn: Janet Hunter |
| 3200 Park Center Drive, |
| Suite #1400 |
| Costa Mesa  AZ  92626 |
| United States |

| **Ship To** |
|---|
| ███████████ |

| Item | Description | Sub Start Date | Sub End Date | Net Amount |
|---|---|---|---|---|
| Starter Essentials Year 2 | Starter Essentials Year 3 | 3/31/2024 | 3/30/2025 | $77,175.00 |

| | |
|---|---|
| **Subtotal** | $77,175.00 |
| **Tax Total** | $0.00 |
| **Total** | **$77,175.00** |

For Canada Only:
GST/ HST Number: ███████████
QST Number: ███████████

Bank Name: JPMorgan Chase
Bank Address: JPMorgan Chase New York, NY 10017

For ACH delivery:
Bank Routing Number: ███████████
Account Number: ███
Account Name: Confluent, Inc. – Receivables Account

For Wire Transfers:
Bank Routing Number: ███████████
Swift Code: ███████
Bank Reference Address: JPMorgan Chase New York, NY 10017
Account Number: ███████
Account Name: Confluent, Inc. – Receivables Account



INV33042

1 of 1