JONATHAN L. SMOLLER, SBN 137013
  *Jonathan.Smoller@offitkurman.com*
ERIKA P. SANCHEZ, SBN 327603
  *Erika.Sanchez@offitkurman.com*
OFFIT KURMAN, P.C.
445 S. Figueroa Street, 18th Floor
Los Angeles, California 90071
Telephone: 213.629.5700
Facsimile: 213.624.9441

Attorneys for Defendant and Counterclaimant
Slower, LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| Confluent, Inc., | Case No. 5:24-cv-04447-SVK |
| Plaintiff, | **DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT AND SECOND AMENDED COUNTERCLAIM** |
| v. | |
| Slower, LLC, | Judge:    Susan van Keulen |
| Defendant. | |
| | **JURY TRIAL DEMAND** |

Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, Defendant Slower, LLC ("Defendant" or "Slower") answers the Complaint of Plaintiff Confluent, Inc. ("Plaintiff" or "Confluent"). If an averment is not specifically admitted, it is hereby denied.

## SECOND AMENDED ANSWER TO COMPLAINT

1.    Answering Paragraph 1, Defendant admits that Plaintiff filed an action against Slower in federal court alleging claims for breach of contract, violation of the Lanham Act, 15 U.S.C. § 1125(a), and violation of various California state laws.

2.    Answering Paragraph 2, Defendant denies each and every allegation contained therein.

3. Answering Paragraph 3, Defendant admits the allegations contained therein.

4. Answering Paragraph 4, Defendant admits the allegations contained therein.

5. Answering Paragraph 5, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 5 of the Complaint and therefore denies each and every allegation contained therein.

6. Answering Paragraph 6, Defendant admits the allegations contained therein.

7. Answering Paragraph 7, Defendant admits that jurisdiction and venue in this Court and that Section 13.5 of the Confluent Standard Reseller Agreement contains the quoted language. Except as so admitted, Defendant denies each and every allegation contained therein.

8. Answering Paragraph 8, Defendant lacks sufficient information and belief to answer the allegation in Paragraph 8 of the Complaint and therefore denies the allegation contained therein.

9. Answering Paragraph 9, Defendant admits that this case is properly assigned to this Court. Except as so admitted, Defendant denies each and every allegation contained therein.

10. Answering Paragraph 10, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 10 of the Complaint and therefore denies each and every allegation contained therein.

11. Answering Paragraph 11, Defendant admits that Slower and Confluent entered into the Confluent Reseller Agreement ("Reseller Agreement") on or about June 12, 2020 and that Exhibit A to the Complaint is a true and correct copy of the Reseller Agreement, the terms of which speak for themselves. Except as so admitted, Defendant denies each and every allegation contained therein.

12. Answering Paragraph 12, Defendant states that the Reseller Agreement is the best evidence as to its terms. Paragraph 12 also contains legal conclusions for which no response is required. Defendant denies the remaining allegations and characterizations in Paragraph 12.

13. Answering Paragraph 13, Defendant states that the Reseller Agreement is the best evidence as to its terms. Paragraph 13 also contains legal conclusions for which no response is required. Defendant denies the remaining allegations and characterizations in Paragraph 13.

Offit|Kurman®
Attorneys At Law

14.    Answering Paragraph 14, Defendant states that the Reseller Agreement is the best evidence as to its terms. Paragraph 14 also contains legal conclusions for which no response is required. Defendant denies the remaining allegations and characterizations in Paragraph 14.

15.    Answering Paragraph 15, Defendant states that the Reseller Agreement is the best evidence as to its terms.

16.    Answering Paragraph 16, Defendant admits that Confluent terminated the Reseller Agreement on April 15, 2024. Except as so admitted, Defendant denies the remaining allegations contained in Paragraph 16.

17.    Answering Paragraph 17, Defendant admits that Slower and Confluent entered into the Confluent Consulting and SI Partner Agreement ("Partner Agreement") in June 2020. Except as so admitted, Defendant denies the remaining allegations contained in Paragraph 17.

18.    Answering Paragraph 18, Defendant states that the Partner Agreement is the best evidence as to its terms. Paragraph 18 also contains legal conclusions for which no response is required. Defendant denies the remaining allegations and characterizations in Paragraph 18.

19.    Answering Paragraph 19, Defendant states that the Partner Agreement is the best evidence as to its terms. Paragraph 19 also contains legal conclusions for which no response is required. Defendant denies the remaining allegations and characterizations in Paragraph 19.

20.    Answering Paragraph 20, Defendant denies the allegations contained therein.

21.    Answering Paragraph 21, Defendant admits the two invoices have not been paid. Except as so admitted, Defendant denies each and every allegation contained therein.

22.    Answering Paragraph 22, Defendant states that the referenced invoice is the best evidence as to its contents.

23.    Answering Paragraph 23, Defendant denies each and every allegation contained therein.

24.    Answering Paragraph 24, Paragraph 24 contains a legal conclusion for which no response is required.

25.    Answering Paragraph 25, Defendant states that the referenced invoice is the best evidence as to its contents.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

26. Answering Paragraph 26, Defendant denies each and every allegation contained therein.

27. Answering Paragraph 27, Paragraph 27 contains a legal conclusion for which no response is required.

28. Answering Paragraph 28, Defendant denies each and every allegation contained therein.

29. Answering Paragraph 29, Defendant denies each and every allegation contained therein.

30. Answering Paragraph 30, Defendant denies each and every allegation contained therein.

31. Answering Paragraph 31, since Plaintiff has not attached a copy of the purported email, which would be the best evidence of its contents, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 31 of the Complaint and therefore denies each and every allegation contained therein.

32. Answering Paragraph 32, since Plaintiff has not attached a copy of the purported email, which would be the best evidence of its contents, or identified the purported "Customer A", Defendant lacks sufficient information and belief to answer the allegations in Paragraph 32 of the Complaint and therefore denies each and every allegation contained therein.

33. Answering Paragraph 33, since Plaintiff has not attached a copy of the purported email, which would be the best evidence of its contents, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 33 of the Complaint and therefore denies each and every allegation contained therein.

34. Answering Paragraph 34, since Plaintiff has not attached a copy of the purported emails referenced in Paragraph 34, which would be the best evidence of their contents, or identified purported Customer A, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 34 of the Complaint and therefore denies each and every allegation contained therein.

35. Answering Paragraph 35, since Plaintiff has not attached a copy of the purported emails referenced in Paragraph 35, which would be the best evidence of their contents, or identified

4    Case No. 5:24-cv-04447-SVK

Offit|Kurman®
Attorneys At Law

purported Customer B, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 35 of the Complaint and therefore denies each and every allegation contained therein.

36. Answering Paragraph 36, since Plaintiff has not attached a copy of the purported emails referenced in Paragraph 36, which would be the best evidence of their contents, or identified the purported other Confluent customers in addition to Customers A, B, and C, Defendant lacks sufficient information and belief to answer the allegations in Paragraph 36 of the Complaint and therefore denies each and every allegation contained therein.

37. Answering Paragraph 37, Defendant denies each and every allegation contained therein.

38. Answering Paragraph 38, Defendant lacks sufficient information and belief to admit or deny the vague and ambiguous or otherwise conclusionary allegations of Plaintiff's alleged protectable trade secrets and therefore denies each and every allegation contained therein.

39. Answering Paragraph 39, Defendant denies each and every allegation contained therein.

40. Answering Paragraph 40, Defendant incorporates by reference its responses herein to Paragraphs 1 through 39 of the Complaint.

41. Answering Paragraph 41, Paragraph 41 contains legal conclusions to which no response is required. Defendant denies the remaining allegations and characterizations contained in Paragraph 41.

42. Answering Paragraph 42, Defendant denies each and every allegation contained therein.

43. Answering Paragraph 43, Defendant denies each and every allegation contained therein.

44. Answering Paragraph 44, Defendant denies each and every allegation contained therein.

45. Answering Paragraph 45, Defendant denies each and every allegation contained therein.

Case No. 5:24-cv-04447-SVK

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT AND SECOND AMENDED COUNTERCLAIM

46. Answering Paragraph 46, Defendant incorporates by reference its responses herein to Paragraphs 1 through 45 of the Complaint.

47. Answering Paragraph 47, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported second cause of action for intentional interference with prospective business advantage with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant further lacks sufficient information and belief to admit or deny the vague and ambiguous allegations contained therein and therefore denies each and every allegation contained therein.

48. Answering Paragraph 48, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported second cause of action for intentional interference with prospective business advantage with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant denies each and every allegation contained therein.

49. Answering Paragraph 49, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported second cause of action for intentional interference with prospective business advantage with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Paragraph 49 contains legal arguments and conclusions for which no response is required. Defendant denies remaining allegations contained therein.

50. Answering Paragraph 50, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported second cause of action for intentional interference with prospective business advantage with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant denies each and every allegation contained therein.

51. Answering Paragraph 51, Defendant incorporates by reference its responses herein to Paragraphs 1 through 50 of the Complaint.

52. Answering Paragraph 52, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported third cause of action for violation of California's Uniform Trade Secrets Act with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant lacks sufficient information and belief to admit or deny the vague and ambiguous or otherwise conclusionary allegations of Plaintiff's alleged protectable trade secrets and therefore denies each and every allegation contained therein.

53. Answering Paragraph 53, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported third cause of action for violation of California's Uniform Trade Secrets Act with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant denies each and every allegation contained therein.

54. Answering Paragraph 54, Defendant states that the Court granted Defendant's motion to dismiss as to Plaintiff's purported third cause of action for violation of California's Uniform Trade Secrets Act with leave to amend which Plaintiff failed to do by the Court-ordered deadline of February 28, 2025, and therefore Plaintiff's purported claim is a nullity and no response is required by Defendant. Additionally, Defendant denies each and every allegation contained therein.

55. Answering Paragraph 55, Defendant incorporates by reference its responses herein to Paragraphs 1 through 54 of the Complaint.

56. Answering Paragraph 56, Defendant denies each and every allegation contained therein.

57. Answering Paragraph 57, Defendant denies each and every allegation contained therein.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit | Kurman®
Attorneys At Law

58. Answering Paragraph 58, Paragraph 58 contains legal conclusions and legal argument for which no response is required. Defendant denies each and every remaining allegation contained therein.

59. Answering Paragraph 59, Paragraph 59 contains legal conclusions and legal argument for which no response is required. Defendant denies each and every remaining allegation contained therein.

60. Answering Paragraph 60, Paragraph 60 contains legal conclusions and legal argument for which no response is required. Defendant denies each and every remaining allegation contained therein.

61. Answering Paragraph 61, Defendant incorporates by reference its responses herein to Paragraphs 1 through 60 of the Complaint.

62. Answering Paragraph 62, Defendant lacks sufficient information and belief to answer the allegation in Paragraph 62 of the Complaint and therefore denies the allegation contained therein.

63. Answering Paragraph 63, Defendant lacks sufficient information and belief to answer the allegation in Paragraph 63 of the Complaint and therefore denies the allegation contained therein.

64. Answering Paragraph 64, Defendant denies each and every allegation contained therein.

65. Answering Paragraph 65, Paragraph 65 contains legal conclusions and/or legal argument for which no response is required. Defendant denies each and every remaining allegation contained therein.

66. Answering Paragraph 66, Paragraph 66 contains legal conclusions and/or legal argument for which no response is required. Defendant denies each and every remaining allegation contained therein.

67. Answering the Prayer for Relief, Defendant denies that Plaintiff is entitled to any of the relief sought in the Prayer for Relief.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

## AFFIRMATIVE DEFENSES

Defendant pleads the following separate defenses. Defendant reserves the right to assert additional affirmative defenses that discovery indicates are proper.

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1.    As a separate and first affirmative defense to the Complaint, and to the purported causes of action set forth therein, Defendant alleges that the Complaint fails to state facts sufficient to constitute a cause of action.

### SECOND AFFIRMATIVE DEFENSE

### (Estoppel)

2.    As a separate and second affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that by Plaintiff's acts, omissions and conduct, Plaintiff's claims are barred in whole or in part  by the doctrine of estoppel.

### THIRD AFFIRMATIVE DEFENSE

### (Waiver)

3.    As a separate and third affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that by Plaintiff's acts, omissions and conduct, Plaintiff's claims are barred in whole or in part  by the doctrine of waiver.

### FOURTH AFFIRMATIVE DEFENSE

### (Laches)

4.    As a separate and fourth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff's claims are barred in whole or in part by the doctrine of laches.

### FIFTH AFFIRMATIVE DEFENSE

### (Statute of Limitations)

5.    As a separate and fifth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that the purported causes of action asserted in the Complaint are barred by such statutes of limitation as may be applicable, including, but not limited

9                    Case No. 5:24-cv-04447-SVK

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit | Kurman®
Attorneys At Law

to, California *Code of Civil Procedure* §§ 335, 335.1, 336, 337, 338, 339, 340, 340.5, 340.9, 343, 344, and 474.

## SIXTH AFFIRMATIVE DEFENSE

### (Unclean Hands)

6.      As a separate and sixth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff's claims are barred in whole or in part by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

### (Consent/Ratification)

7.      As a separate and seventh affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that by Plaintiff's acts, omissions and conduct, Plaintiff's claims are barred in whole or in part because Plaintiff and/or persons acting on its behalf consented to, ratified and/or acquiesced in the subject conduct.

## EIGHTH AFFIRMATIVE DEFENSE

### (Privilege)

8.      As a separate and eighth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that in each act or statement done or made by Defendant, its officers, employees, and/or agents, with reference to Plaintiff were and continue to be made in good faith and are proper assertions of Defendant's legal rights and obligations and therefore, were and are privileged.

## NINTH AFFIRMATIVE DEFENSE

### (Justification)

9.      As a separate and ninth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that by virtue of the acts, omissions and conduct of Plaintiff, Plaintiff is barred or precluded in whole or in part from any relief or recovery under the Complaint because the acts of Defendant as alleged in the Complaint were justified and/or excused.

/ / /

/ / /

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit|Kurman®
Attorneys At Law

**TENTH AFFIRMATIVE DEFENSE**

**(Business Judgment)**

10.     As a separate and tenth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that the alleged actions it took were in the exercise of reasonable business judgment.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Excuse of Performance)**

11.     As a separate and eleventh affirmative defense to the Complaint, Defendant alleges that as to the first cause of action of the Complaint, Plaintiff is barred or precluded from recovery because Slower's obligations to Plaintiff under the subject agreements were excused by, *inter alia*, Plaintiff's antecedent material and substantial breaches of the agreements, a failure of consideration, a failure of conditions, and frustration of purpose.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Failure of Consideration)**

12.     As a separate and twelfth affirmative defense to the Complaint, Defendant alleges that as to the first cause of action of the Complaint, Plaintiff is barred or precluded from recovery because there was a failure of consideration under the subject agreements by virtue of Plaintiff's wrongful conduct in, *inter alia*, causing Slower's customers to cease doing business with Slower.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Failure of Conditions)**

13.     As a separate and thirteenth affirmative defense to the Complaint, Defendant alleges that as to the first cause of action of the Complaint, Plaintiff is barred or precluded from recovery under the subject agreements alleged in the Complaint because of the non-occurrence of conditions precedent and/or the happening of conditions subsequent.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Prior Material Breach)**

14.     As a separate and fourteenth affirmative defense to the Complaint, Defendant alleges that as to the purported first cause of action in the Complaint, Plaintiff is barred or precluded from

11

recovery under the subject agreements by reason of Plaintiff's prior material breaches of the subject agreements.

### FIFTEENTH AFFIRMATIVE DEFENSE

**(Prevention of Performance)**

15. As a separate and fifteenth affirmative defense to the Complaint, Defendant alleges that as to the first cause of action in the Complaint, Plaintiff is barred or precluded from relief or recovery of damages, if any, in whole or in part, to the extent Plaintiff prevented Defendant from performing the subject agreements alleged in the Complaint.

### SIXTEENTH AFFIRMATIVE DEFENSE

**(Substantial Performance)**

16. As a separate and sixteenth affirmative defense to the Complaint, Defendant allege that as to the first cause of action in the Complaint, Plaintiff is barred or precluded from relief or recovery of damages, if any, in whole or in part, because Defendant substantially performed the subject agreements alleged in the Complaint.

### SEVENTEENTH AFFIRMATIVE DEFENSE

**(Breach of Implied Duty of Good Faith)**

17. As a separate and seventeenth affirmative defense to the Complaint, Defendant alleges that Plaintiff's claims, and the damages alleged in the Complaint, are barred or precluded in whole or in part by virtue of Plaintiff's breaches of the duty of good faith and fair dealing implied in the subject agreements alleged in the Complaint.

### EIGHTEENTH AFFIRMATIVE DEFENSE

**(Intervening and Superseding Cause)**

18. As a separate and eighteenth affirmative defense to the Complaint and the purported causes of action contained therein, Defendant alleges that if Plaintiff suffered any loss, damage or injury as alleged in the Complaint, such loss, damage or injury was proximately caused or contributed to by the conduct of other parties, persons, or entities (wrongful or otherwise) and that such conduct was an intervening and superseding cause of any such loss, damage or injury of which Plaintiff complains.

Offit|Kurman®
Attorneys At Law

## NINETEENTH AFFIRMATIVE DEFENSE

### (Lack of Standing)

19.    As a separate and nineteenth affirmative defense to the Complaint, Defendant alleges that as to the purported fourth cause of action in the Complaint, Plaintiff lacks standing to assert an Unfair Competition Law, Bus. & Prof. Code § 17200 et seq. claim against Defendant.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Lack of Fraudulent or Unfair Business Practices)

20.    As a separate and twentieth affirmative defense to the Complaint, Defendant alleges that as to the purported fourth cause of action in the Complaint, Defendant's actions were not deceptive, fraudulent, or unfair business practices.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Fair Use)

21.    As a separate and twenty-first affirmative defense to the Complaint, Defendant alleges as to the purported fifth cause of action in the Complaint, Plaintiff is barred and precluded from recovery based on the fair use doctrine.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (No Injury or Damage)

22.    As a separate and twenty-second affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff has not been injured or damaged as a proximate result of any act or omission for which Defendant is responsible.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

23.    As a separate and twenty-third affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff's claims, if any, are barred for its failure to mitigate or otherwise diminish any purported damages. If not completely barred, Plaintiff's recovery against Defendant must be reduced to the extent that Plaintiff's damages, if any, were caused by Plaintiff's failure to mitigate those damages, if any.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Speculative and Uncertain Damages)

24.    As a separate and twenty-fourth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff's damages, if any, are too uncertain and speculative to be recoverable from Defendant.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

25.    As a separate and twenty-fifth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that Plaintiff is  barred or precluded from recovery in whole or in part based on the doctrine of unjust enrichment.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Adequate Remedy at Law)

26.    As a separate and twenty-sixth affirmative defense to the Complaint and each of cause of action contained therein seeking injunctive relief, Defendant alleges that Plaintiff has an adequate remedy at law.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (Offset/Setoff/Cross-Demand)

27.    As a separate and twenty-seventh affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that by virtue of the acts of Confluent and/or persons acting on behalf of Confluent, Slower has been damaged in an amount equal to or greater than the amount of damages, if any, to which Plaintiff might be entitled. As a result, Defendant is entitled to an offset against any sums found owing to Slower from Confluent.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (Ongoing Investigation)

28.    As a separate and twenty-eighth affirmative defense to the Complaint and each purported cause of action contained therein, Defendant alleges that it has not yet completed a thorough investigation or study or completed the discovery of all the facts and circumstances of the subject matter of the Complaint and, accordingly, reserves the right to amend, modify, revise, or

supplement its answer and to plead such other defenses and take such other further actions as it may deem proper and necessary in its defense upon completion of said investigation and/or study.

WHEREFORE, Defendant prays for relief as follows:

29.    That the Complaint be dismissed, with prejudice and in its entirety.

30.    That Plaintiff take nothing by reason of its Complaint and that judgment be entered against Plaintiff and in favor of Defendant.

31.    That Defendant be awarded its reasonable attorney's fees in defending this action.

32.    That Defendant be awarded its costs incurred in defending this action.

33.    That Defendant be granted such other and further relief as the Court may deem just and proper.

## SECOND AMENDED COUNTERCLAIMS

Defendant and Counterclaimant Slower, LLC ("Slower"), by and through its attorneys, for its Counterclaims against Plaintiff and Counter-Defendant Confluent, Inc. ("Confluent"), alleges as follows:

## PARTIES

1.    Slower is a California limited liability company with its principal place of business in Irvine, California.

2.    Confluent is a Delaware corporation organized with its principal place of business in Mountain View, California.

## JURISDICTION AND VENUE

3.    This Court has original subject matter jurisdiction over the claims for trade secret misappropriation arising under 28 U.S.C. § 1331 and the Defend Trade Secrets Act of 2016 pursuant to 18 U.S.C. § 1836(c). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

4.    Jurisdiction and venue are proper in this Court because Confluent's obligations, breaches, and wrongful acts took place in this District. Confluent also agreed that any dispute with Slower "shall by subject to the exclusive jurisdiction of and venue in the federal and state courts within Santa Clara County, California" and "consent[ed] to the personal and exclusive jurisdiction

Case No. 5:24-cv-04447-SVK

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

and venue of these Courts."

## **GENERAL ALLEGATIONS**

### **Slower**

5.    Slower is a professional technology services and business consulting firm. Slower provides professional services to its customers including, but not limited to, IT consulting and engineering, data, cybersecurity, and cloud engineering.

6.    Since its formation, Slower has cultivated and developed extensive business relationships and provided its business strategy and information technology consulting services to a variety of large, multi-million and billion-dollar companies in various industries. During this period, Slower developed a strong brand reputation in the information technology industry.

### **Slower and Confluent's Relationship Begins**

7.    Slower is informed and believes and thereon alleges that Confluent develops and sells subscriptions to a software data management platform that includes open source and proprietary components ("Confluent Software") and provides related services.

8.    In or about 2018, Confluent approached Slower about providing consulting and advisory services (e.g., guidance regarding architecture, best practices, and governance for the configuration and deployment of the Confluent Software) to Confluent for Confluent's customers. Thereafter, Confluent and Slower entered into the first of several agreements between the parties, i.e., a Master Consulting Agreement as of September 10, 2018, whereby Slower agreed to perform consulting and advisory services to Confluent's customers pursuant to statements of work ("SOW") in exchange for professional fees as set forth in the SOWs.[1]

9.    In December 2019, Confluent and Slower entered into a Confluent Subscription Agreement for Managed Services, wherein Confluent agreed to license the Confluent Software to Slower for Slower's use in selling a software solution to one of Slower's customers (referred herein

---

[1] The Master Consulting Agreement was amended once in December 2018 and again in November 2020. Confluent and Slower entered into a new Master Consulting Agreement on or about December 17, 2021.

Case No. 5:24-cv-04447-SVK

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit|Kurman®
Attorneys At Law

as Customer F) as a managed service.[2]

10.   Slower quickly became a trusted provider of consulting services to Confluent, such that in early 2020 Confluent approached Slower about becoming a reseller of Confluent Software and participating in Confluent's channel partner programs. Slower is informed and believes and alleges thereon that Confluent knew Slower had a substantial customer base and that by engaging Slower as a reseller of Confluent Software, Confluent would substantially grow its customer base. Slower viewed its burgeoning relationship with Confluent as an opportunity to expand its business revenue by not only reselling Confluent Software to Slower's existing customers at a marked-up price (while still providing those existing customers with professional services) but also to acquire new customers for the Confluent Software and then cross-sell its professional services to such customers.

11.   Based on the expectation of increased business revenue, Slower agreed to become a reseller of Confluent Software. To become a reseller of Confluent Software, Confluent required Slower to enter into two agreements with Confluent. First, Confluent and Slower entered into the Confluent Standard Reseller Agreement (the "Reseller Agreement") effective as of June 9, 2020. A copy of the Reseller Agreement is attached to Confluent's Complaint as Exhibit A. Pursuant to the terms of the Reseller Agreement, Confluent appointed Slower to resell the Confluent Software and associated technical support services to customers (i.e., "End Users") worldwide. Second, Confluent and Slower entered into the Confluent Consulting and SI Partner Agreement (the "Partner Agreement"). A copy of the Partner Agreement is attached to Confluent's Complaint as Exhibit B. The Partner Agreement governed Slower's use of Confluent's trademarks in connection with the sales and marketing of Confluent's products and services and receiving benefits available under the Confluent Partner Program.

---

[2] In April 2020, Confluent and Slower entered into a Confluent Subscription Agreement for Managed Services, which the parties intended would govern any additional Slower orders from Confluent for licensing of Confluent Software for managed service agreements with Slower customers.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

12.     Additionally, to enhance Slower's performance under the Reseller Agreement and Partner Agreement, Confluent and Slower entered into a Partner Enablement Services Collaboration Agreement effective June 1, 2022 (the "Partner Collaboration Agreement"), a copy of which is attached as Exhibit 1, whereby Slower paid Confluent $350,000 to have Confluent provide personnel support to Slower to assist with, *inter alia*, joint marketing efforts.

## Confluent Touts Slower's Performance

13.     Slower became one of Confluent's best partners, establishing countless new customer relationships for Confluent to provide its Confluent Software and related services.

14.     In or about February 2022, Confluent invited Slower to give a presentation on how Slower successfully engaged and secured an account with Customer B for Confluent.

15.     In or about October 2022, Slower, along with AWS, Google, and others, was a named sponsor at Confluent's data streaming industry conference, Current 2022: The Next Generation of Kafka Summit.

16.     On or about August 3, 2022, the Director of Americas Partner Ecosystem at Confluent described Slower as a "Confluent Premier Partner, and one of our best AMER SI partner." He went on to write "As examples, they were instrumental in several large key wins – [Customer F], [Customer D], [Customer B], [additional customers], and many more."

17.     On or about August 3, 2022, Confluent CEO Jay Kreps recognized Slower as an AWS CPPO GTM partner during Confluent's earnings call.

## Slower Customers

## Customer B

18.     Customer B was a preexisting Slower customer with whom Slower had a profitable business relationship. Customer B was looking to upgrade its data streaming capabilities and Slower invested a significant amount of time and money promoting Confluent to Customer B.

19.     On or about August 19, 2021, Slower and Customer B entered into a Reseller and Professional Services Agreement ("Customer B Agreement") for Slower to provide Customer B with Confluent Software and professional services for an initial 3-year term, with an automatic renewal for additional terms of one year unless terminated earlier. The yearly fees to Slower under

18

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

the Customer B Agreement were $624,000.

20.    Slower is informed and believes and thereon alleges that prior to the expiration of the initial term of the Customer B Agreement, Confluent professional services and/or sales representatives communicated with Customer B directly and told Customer B to stop working with Slower and to refrain from purchasing any future Confluent software or professional services from Slower. Slower is informed and believes and thereon alleges that Confluent further told Customer B to purchase Confluent Software and professional services from Confluent directly or another Confluent partner.

21.    Slower is informed and believes and thereon alleges that Confluent misled Customer B by stating one or more falsehoods about Slower, including that Slower did not have the depth and breadth to service Customer B's requirements, Slower is working poorly on Confluent engagements, Slower is not a real company, and Slower is stealing revenue from customers by not properly delivering services, all of which statements are and were untrue. Slower is informed and believes and alleges thereon that Confluent engaged in such dishonest, unethical, and unfair conduct so as to take Customer B and its substantial business revenue away from Slower.

22.    As a direct and proximate result of Confluent's actions and false statements to Customer B, Slower lost its business relationship with Customer B along with significant reseller software revenue and professional services revenue.

### Customer C

23.    Customer C was a preexisting Slower customer with whom Slower had a profitable business relationship. Customer C was looking to upgrade it data streaming capabilities and Slower invested significant time and money promoting Confluent to Customer C.

24.    In or about 2022, Slower and Customer C entered into an agreement for Slower to provide Customer C with Confluent Software and professional services for an initial 3-year term with renewal rights unless terminated earlier ("Customer C Agreement"). The yearly fees to Slower under the Customer C Agreement were $325,000.

25.    Slower is informed and believed and thereon alleges that prior to the expiration of the initial term of the Customer C Agreement, Confluent professional services and/or sales

Offit|Kurman®
Attorneys At Law

representatives communicated with Customer C directly and told Customer C to stop working with Slower and to refrain from purchasing any future Confluent software or professional services from Slower. Slower is informed and believes and thereon alleges that Confluent further told Customer C to purchase Confluent software and professional services from Confluent directly or another Confluent partner.

26. Slower is informed and believes and thereon alleges that Confluent misled Customer C by stating one or more falsehoods about Slower, including that Slower did not have the depth and breadth to service Customer C's requirements, Slower is working poorly on Confluent engagements, Slower is not a real company, and slower is stealing revenue from customers by not properly delivering services, all of which statements are and were untrue. Slower is informed and believes and thereon alleges that Confluent engaged in such dishonest, unethical, and unfair conduct so as to take Customer C and its substantial business revenue away from Slower.

27. As a direct and proximate result of Confluent's actions and false statements to Customer C, Slower lost its business relationship with Customer C along with significant reseller software revenue and professional services revenue.

**Customer D**

28. In or about December 2020, Slower and Customer D entered into an agreement ("Customer D Agreement") for Slower to provide Customer D with Confluent Software and professional services for an initial 3-year term, with renewals for additional years unless terminated earlier. The yearly fees to Slower under the Customer D Agreement were in excess of $1,000,000.

29. Slower is informed and believes and thereon alleges that prior to the expiration of the initial term of the Customer D Agreement, Confluent professional services and/or sales representative communicated with Customer D directly and told Customer D to stop working with Slower and to refrain from purchasing any future Confluent software or professional services from Slower. Slower is informed and believes and thereon alleges that Confluent further told Customer D to purchase Confluent software and professional services from Confluent directly or another Confluent partner.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit | Kurman®
Attorneys At Law

30.     Slower is informed and believes and thereon alleges that Confluent misled Customer D by stating one or more falsehoods about Slower, including that Slower did not have the depth and breadth to service Customer D's requirements, Slower is working poorly on Confluent engagements, Slower is not a real company, and Slower is stealing revenue from customers by not properly delivering services, all of which statements are and were untrue. Slower is informed and believes and alleged thereon that Confluent engaged in such dishonest, unethical, and unfair conduct so as to take Customer D and its substantial business revenue away from Slower.

31.     As a direct and proximate result of Confluent's actions and false statements to Customer D, Slower lost its business relationship with Customer D along with significant reseller software revenue and professional services revenue.

**Customer E**

32.     On or about June 30, 2020, Slower and Customer E entered into a Master Agreement ("Customer E Agreement") for Slower to provide Customer E with Confluent Software and professional services for an initial 3-year term (with rights of renewal). The fees to Slower under Customer E Agreement were $348,300.

33.     Slower is informed and believes and thereon alleges that prior to the expiration of the initial term of the Customer E Agreement, Confluent professional services and/or sales representatives communicated with Customer E directly and told Customer E to stop working with Slower and to refrain from purchasing any future Confluent Software or professional services from Slower. Slower is informed and believes and thereon alleges that Confluent further told Customer E to purchase Confluent Software and professional services from Confluent directly or another Confluent partner.

34.     Slower is informed and believes and thereon alleges that Confluent misled Customer E by stating one or more falsehoods about Slower, including that Slower did not have the depth and breadth to service Customer E's requirements, Slower is working poorly on Confluent engagements, Slower is not a real company, and Slower is stealing revenue from customers by not properly delivering services, all of which statements are and were untrue. Slower is informed and believes and alleges thereon that Confluent engaged in such dishonest, unethical, and unfair conduct so as to

21                                           Case No. 5:24-cv-04447-SVK

take Customer E and its substantial business revenue away from Slower.

35.    As a direct and proximate result of Confluent's actions and false statements to Customer E, Slower lost its business relationship with Customer E along with significant reseller software revenue and professional services revenue.

### Customer F

36.    On or about December 23, 2019, Confluent and Slower entered into a Confluent Subscription Agreement for Managed Services ("Managed Services Agreement"), a copy of which is attached hereto as Exhibit 2 (with redactions), wherein Confluent agreed to license the Confluent Software to Slower for Slower's use in selling a software solution to one of Slower's customers (Customer F) as a managed service. In connection therewith, Slower and Customer F entered into an agreement ("Customer F Agreement") for Slower to provide Customer F with Confluent Software and professional services for an initial 3-year term commencing on February 1, 2020. The total 3-year subscription fees were $2,999,999.

37.    Slower is informed and believed and thereon alleges that prior to the expiration of the initial term of the Customer F Agreement, Confluent professional services and/or sales representatives communicated with Customer F directly and told Customer F to stop working with Slower and to refrain from purchasing any future Confluent Software or professional services from Slower. Slower is informed and believes and thereon alleges that Confluent further told Customer F to purchase Confluent Software and professional services from Confluent directly or another Confluent partner.

38.    Slower is informed and believes and thereon alleges that Confluent misled Customer F by stating one or more falsehoods about Slower, including that Slower did not have the depth and breadth to service Customer F's requirements, Slower is working poorly on Confluent engagements, Slower is not a real company, and Slower is stealing revenue from customers by not properly delivering services, all of which statements are and were untrue. Slower is informed and believes and alleges thereon that Confluent engaged in such dishonest, unethical, and unfair conduct so as to take Customer F and its substantial business revenue away from Slower.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

39. As a direct and proximate result of Confluent's actions and false statements to Customer F, Slower lost its business relationship with Customer F along with significant reseller software revenue and professional services revenue.

**Confluent Misappropriates Slower's Confidential Proprietary Information**

40. Over the years, Slower has invested time, money, and resources to develop its post-sales Center of Excellence Framework ("Secret Framework"), a trade secret that contains Slower's specific processes, implementation strategies, and proposed initiatives for how to democratize the use and consumption of Confluent Platform and Confluent Cloud for the particular customer based on and tailored to the customer's structure, needs, and goals. The monetary value of the Secret Framework is believed to be in excess of $400,000.

41. The Secret Framework derives independent economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure and use because potential customers seek out Slower's specific methods, techniques, and processes, which Slower has created and developed and which are unique to Slower, to be able to use and consume Confluent Platform and Confluent Cloud that the customers have purchased.

42. Slower employs, and has employed, reasonable efforts to maintain the secrecy of its confidential information, including the Secret Framework, by, *inter alia*, restricting access to the information to only those who have express permission to use such confidential information. Slower's Secret Framework is housed in a password protected drive that requires multi-factor authentication for access. The only individuals with access to the Secret Framework are Slower's Chief Executive Officer, Rikin Shah ("Shah"); Slower's Midwest General Manager, Peter Redlingshafer ("Redlingshafer"); and Slower's General Manager West, Tom White.

43. In or about November 2020, Derek Kane ("Kane"), a Confluent employee and Account Executive for various Slower-Confluent customer accounts, had a phone meeting with Shah and Redlingshafer to discuss various customer accounts. During that phone meeting, Kane requested—multiple times—that Shah and Redlingshafer share the Secret Framework with him under the guise that Kane would use the Secret Framework to review and evaluate Slower before facilitating introductions to Kane's target accounts and new Slower customers.

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

Offit | Kurman®
Attorneys At Law

44.    On that same call, Shah and Redlingshafer asked Kane not to share the Secret Framework with anyone internally (including, but not limited to, Confluent's Professional Services team) or to Kane's clients. Kane assured and promised Shah and Redlingshafer that he would not share the Secret Framework with anyone, telling them that, "don't worry I won't take what you have" and "you have my trust."

45.    Following the call, Slower shared a copy of the Secret Framework with Kane.

46.    Slower subsequently learned from two former Confluent employees that the Secret Framework had been shared by Confluent internally and with third-party target customers.

47.    Slower is informed and believes and thereon alleges that, without Slower's express permission, Kane shared a presentation containing Slower's Secret Framework, disguising the Secret Framework as Confluent work product, internally to other Confluent employees and to new third-party accounts that Confluent was targeting and attempting to secure bypassing Slower. Kane's act of sharing the Secret Framework with third-party target customers constitutes a breach of Paragraph 12.1 of the Reseller Agreement.

## FIRST COUNTERCLAIM

**(Misappropriation of Trade Secrets Pursuant to the Defend Trade Secrets Act)**

48.    Slower hereby incorporates by reference the allegations of paragraphs 1 through 47 of this Counterclaim as if set forth in full herein.

49.    Slower created, possessed, and owns its confidential proprietary information, including, but not limited to, the Secret Framework, a trade secret that contains Slower's specific processes, implementation strategies, and proposed initiatives for how to democratize the use and consumption of Confluent Platform and Confluent Cloud for the particular customer based on and tailored to the customer's structure, needs, and goals, which it offers and sells in interstate commerce.

50.    The Secret Framework is not generally known to the public or people and corporations in the relevant software and technology industries.

51.    The Secret Framework derives independent economic value from not being generally known to the public, as it provides a substantial business advantage and enables the creation of

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

economically successful advisory, consulting, and professional services relationships with Slower's clients.

52.    Slower took reasonable efforts under the circumstances to protect the secrecy of these trade secrets, including, but not limited to, the Secret Framework, by restricting access to the information to only those who have express permission to use such confidential information.

53.    Confluent misappropriated trade secrets rightfully belonging to Slower by falsely promising to maintain the secrecy of the Secret Framework and disclosing the Secret Framework without Slower's consent to third-party target customers. Confluent is misusing the appropriated Secret Framework for its own economic and reputational benefit.

54.    Confluent had no express or implied consent from Slower to so use its trade secrets.

55.    Confluent used improper means to acquire knowledge of the trade secrets by misrepresenting to Slower about how it would use the Secret Framework.

56.    As a direct and proximate result of these actions, Slower is entitled to recover damages for any unjust enrichment of Confluent caused by this misappropriation.

57.    As a result of these actions, Slower is entitled to an injunctive relief to prevent the continued misappropriation of its Secret Framework and wrongful possession of Slower's confidential and proprietary information by Confluent.

### SECOND COUNTERCLAIM

**(Misappropriation of Trade Secrets Pursuant to California Uniform Trade Secrets Act)**

58.    Slower hereby incorporates by reference the allegations of paragraphs 1 through 57 of this Counterclaim as if set forth in full herein.

59.    Slower created, possessed, and owns its confidential proprietary information, including, but not limited to, the Secret Framework, a trade secret that contains Slower's specific processes, implementation strategies, and proposed initiatives for how to democratize the use and consumption of Confluent Platform and Confluent Cloud for the particular customer based on and tailored to the customer's structure, needs, and goals, which it offers and sells in interstate commerce.

60.    The Secret Framework is not generally known to the public or people and corporations in the relevant software and technology industries.

61.    The Secret Framework derives independent economic value from not being generally known to the public, as it provides a substantial business advantage and enables the creation of economically successful advisory, consulting, and professional services relationships with Slower's clients.

62.    Slower took reasonable efforts under the circumstances to protect the secrecy of these trade secrets, including, but not limited to, the Secret Framework, by restricting access to the information to only those who have express permission to use such confidential information.

63.    Confluent misappropriated trade secrets rightfully belonging to Slower by falsely promising to maintain the secrecy of the Secret Framework and  disclosing the Secret Framework without Slower's consent to third-party target customers. Confluent is misusing the appropriated Secret Framework for its own economic and reputational benefit.

64.    Confluent had no express or implied consent from Slower to so use its trade secrets.

65.    Confluent used improper means to acquire knowledge of the trade secrets by misrepresenting to Slower about how it would use the Secret Framework.

66.    As a direct and proximate result of these actions, Slower is entitled to recover damages for any unjust enrichment of Confluent caused by this misappropriation.

67.     As a result of these actions, Slower is entitled to injunctive relief to prevent the continued misappropriation of its trade secrets and wrongful possession of Slower's confidential and proprietary information by Confluent.

### THIRD COUNTERCLAIM

**(California Business & Professions Code § 17200)**

68.    Slower hereby incorporates by reference the allegations of paragraphs 1 through 67 of this Counterclaim as if set forth in full herein.

69.    The actions of Confluent described above, including but not limited to, its use of false and unfavorable statements about Slower to Slower's customers and misappropriation and subsequent disclosure of confidential Slower information to unauthorized third parties, constitute

Case No. 5:24-cv-04447-SVK
DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

unlawful, fraudulent, and unfair business practices in violation of California Business & Professions Code sections 17200 *et seq*.

70.    Confluent's conduct is unlawful in that it violated California tort law and the California Uniform Trade Secrets Act, as described more fully herein.

71.    Confluent's actions constitute unfair business practices in that they are practices that "offend[] an established public policy" and/or "immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1365. Specifically, Confluent has made false and misleading statements about Slower and misused Slower's confidential information to not only wrongly take customers (and their substantial business revenue) from Slower but also to acquire new customers for its own benefit, all of which conduct amounts to a threatened impact on competition and likely to deceive members of the public.

72.    Slower has lost money and property as a result of Confluent's unfair competition, including money associated with Slower's loss of reseller and professional service revenue. Slower is entitled to injunctive relief to compel Confluent to: (a) cease and desist from its unlawful disclosures of Slower's proprietary and confidential information; and (b) disgorge and/or destroy all Slower confidential information in its possession, custody, or control. In addition thereto, Slower is entitled to restitution and disgorgement and such other relief permitted under California Business & Professions Code sections 17200 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Slower prays for judgment against Confluent as follows:

1.    That Slower be awarded restitution damages for Confluent's unjust enrichment and wrongful conduct in an amount according to proof at trial.

2.    For disgorgement of Confluent's profits obtained from its wrongful conduct in an amount according to proof at trial.

3.    For injunctive relief against Confluent and its agents, employees, and representatives to cease and desist from using and disclosing Slower's confidential and proprietary information and to return to Slower and/or destroy all confidential Slower information in its possession, custody, or control.

4. For an award of reasonable attorney's fees, expenses, and costs incurred herein.

5. For such other and further relief as this Court may deem just and proper.

DATED: March 24, 2026            OFFIT KURMAN, P.C.


By:        /s/Jonathan Smoller
           Jonathan L. Smoller
           Erika P. Sanchez
           Attorneys for Defendant/Counterclaimant
           Slower, LLC

4936-8331-4074, v. 3

DEFENDANT SLOWER, LLC'S SECOND AMENDED ANSWER TO COMPLAINT
AND SECOND AMENDED COUNTERCLAIM

# EXHIBIT 1

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

## PARTNER ENABLEMENT SERVICES COLLOBORATION AGREEMENT

This Partner Enablement Services Agreement ("Agreement") is made and entered into as of June 1, 2022 ("Effective Date") by and between Slower, LLC ("Customer") having a principal place of business at 3200 Park Center Drive, Suite #1400, Costa Mesa CA 92626 and Confluent, Inc. ("Service Provider") having a principal place of business at 899 West Evelyn Avenue, Mountain View, CA 94041.

1.     Engagement of Services. Service Provider has been engaged to provide partner enablement services ("Services") to Customer as described in Exhibit A to this Agreement, which is attached and incorporated herein by this reference. The terms of this Agreement will govern all Services undertaken by Service Provider for Customer under this Agreement. Service Provider will perform the Services under this Agreement in a timely, professional and workmanlike manner.

2.     Compensation. Customer will pay Service Provider a fee as set forth in Exhibit A ("Fees"). Subject to Customer's preapproval of expenses in writing, Customer will reimburse Service Provider's documented, out-of-pocket expenses and actual costs no later than thirty (30) days after Customer's receipt of Service Provider's invoice. Upon termination of this Agreement for any reason, Service Provider will be (a) paid fees on the basis stated in Exhibit A for all Services performed and for all Fees and (b) reimbursed for expenses incurred prior to termination of this Agreement.

3.     Fees. The Fees for the applicable Term, will be set forth in Exhibit A, and such Fees shall be paid in advance on an annual basis as set forth therein.

4.     Independent Contractor Relationship. Service Provider's relationship with Customer is that of an independent contractor, and nothing in this Agreement is intended to, or shall be construed to, create a partnership, agency, joint venture, employment or similar relationship. Service Provider will not be entitled to any of the benefits that Customer may make available to its employees, including, but not limited to, group health or life insurance, profit-sharing or retirement benefits. Service Provider is not authorized to make any representation, contract or commitment on behalf of Customer unless specifically requested or authorized in writing to do so by a Customer manager. Likewise, Customer is not authorized to make any representation, contract or commitment on behalf of Service Provider unless specifically authorized in writing to do so by a Service Provider manager. Service Provider is solely responsible for (i) any and all federal, state, local, or other taxes based on or measured by Service provider's net income or receipts and (ii) taxes for Service provider's personnel. Fees under this Agreement are exclusive of federal, state, or local taxes, or other sales, use, value-added, excise, personal property, or other similar taxes; when applicable, such taxes will appear as a separate item on service provider's invoice and such invoice shall specifically identify the taxable and non-taxable services, and applicable tax rates. No part of Service Provider's compensation will be subject to withholding by Customer for the payment of any social security, federal, state or any other employee payroll taxes. Customer will regularly report amounts paid to Service Provider by filing Form 1099-MISC with the Internal Revenue Service as required by law.

5.     Confidentiality.

5.1     Definition of Confidential Information. "Confidential Information" means (a) any technical and non-technical information related to either party's business and current, future and proposed products and services, including for example and without limitation, Customer Property or Service Provider's Property (as defined in Section 6 (Ownership and Return of Confidential Information; Customer Property and Service Provider Property)), and either party's research, development, design details and specifications, financial information, procurement requirements, engineering and manufacturing information, customer

1

4891-1790-8233.3

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

lists, customer information, business forecasts, sales information, marketing plans and business plans, in each case whether or not marked as "confidential" or "proprietary" and (b) any information that either party has received from others that may be made known and is obligated to treat as confidential or proprietary, whether or not marked as "confidential" or "proprietary".

5.2     Nondisclosure and Nonuse Obligations. Except as permitted in this Section, neither party will use the other party's Confidential Information, or disseminate or in any way disclose the other party's Confidential Information, to any person, firm, business or governmental agency or department.  Each party shall treat the other party's Confidential Information with the same degree of care as it treats its own confidential information, but in no case shall use less than reasonable care.  Each party may disclose Confidential Information only to those employees or agents who have a need to know the information as necessary to perform this Agreement.  Each party certifies that each of its employees will have agreed, either as a condition of employment or in order to obtain the Confidential Information, to be bound by terms and conditions at least as protective as those terms and conditions under this Agreement.  Each party shall immediately give notice to the other party of any unauthorized use or disclosure of the Confidential Information of the other party.  Each party shall assist the other party in remedying any the unauthorized use or disclosure of the other party's Confidential Information.  Each party agrees not to communicate any information to the other party in violation of the proprietary rights of any third party.

5.3     Exclusions from Nondisclosure and Nonuse Obligations.  Obligations under Section 5.2 do not apply to any Confidential Information that the receiving party can demonstrate (a) was in the public domain at or subsequent to the time the Confidential Information was communicated to the receiving party through no fault of receiving party; (b) was rightfully in receiving party's possession free of any obligation of confidence at or subsequent to the time the Confidential Information was communicated to receiving party by the disclosing party; or (c) was independently developed by employees of the receiving party without use of, or reference to, any Confidential Information communicated to the receiving party.  A disclosure of any Confidential Information (a) in response to a valid order by a court or other governmental body or (b) as otherwise required by law will not be considered to be a breach of this Agreement or a waiver of confidentiality for other purposes; provided, however, that the receiving party provides prompt prior written notice thereof to the disclosing party, provided such notice is allowable by law, to enable the disclosing party to seek a protective order or otherwise prevent the disclosure.

6.     Ownership and Return of Confidential Information; Customer Property and Service Provider Property.  All Confidential Information and any materials and items (including, without limitation, software, equipment, tools, artwork, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Customer furnishes to Service Provider by Customer, whether delivered to Service Provider by Customer or made by Customer under this Agreement and whether or not they contain or disclose Confidential Information (collectively, the "Customer Property"), are the sole and exclusive property of Customer or Customer's suppliers or customers.  Service Provider agrees to keep all Customer Property at Service Provider's premises unless otherwise permitted in writing by Customer.  Within five (5) days after any request by Customer, Service Provider shall destroy or deliver to Customer, at Customer's option, (a) all Customer Property and (b) all materials and items in Service Provider's possession or control that contain or disclose any Customer Confidential Information.  All Confidential Information and any materials and items (including, without limitation, software, equipment, tools, artwork, documents, drawings, papers, diskettes, tapes, models, apparatus, sketches, designs and lists) that Service Provider furnishes to Customer, whether delivered to Customer by Service Provider or made by Service Provider in the performance of Services under this Agreement and whether or not they contain or disclose Confidential Information (collectively, the "Service Provider Property"), are the sole and exclusive property of Service Provider or Service Provider's suppliers or customers.  Customer agrees to keep all Service Provider Property at Customer's premises unless otherwise permitted in writing by Service Provider.  Within five (5) days after any request by Customer, Customer shall destroy or deliver to Service Provider, at Service

2

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

Provider's option, (a) all Service Provider Property and (b) all materials and items in Customer's possession or control that contain or disclose any Service Provider Confidential Information.

7.      Warranties.

7.1     Service Provider and Customer Warranty. Each party represents and warrants that it has the right, power, and authority to enter into, and perform its obligations under this Agreement.

7.2     Service Provider Warranty and Remedy. Service Provider warrants that the Services will be performed by qualified personnel in a professional and workmanlike manner consisted with applicable industry standards. Customer may notify Service Provider in writing of any alleged failure by Service Provider to perform the Services in accordance with the foregoing warranty within thirty (30) days of the delivery of the affected Services. Customer's exclusive remedy and Service Provider's sole obligation for failure to perform this warranty is for Service Provider to correct the performance within thirty (30) days of notice of non-conformance.

8.      Disclaimer. SERVICE PROVIDER EXPRESSLY DISCLAIMS ALL OTHER REPRESENTATIONS, WARRANTIES AND CONDITIONS WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, SATISFACTORY QUALITY, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

9.      Consequential Damages Waiver. EXCEPT FOR A BREACH OF SECTION 5, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOSS OF USE, INTERRUPTION OF BUSINESS OR ANY INDIRECT, EXEMPLARY, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY TYPE OR KIND (INCLUDING LOST PROFITS OR LOSS OF DATA) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF THIS AGREEMENT OR ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS DEEMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

10.     Limitation of Liability. EXCEPT FOR A BREACH OF SECTION 5 OR THE EXPRESS PAYMENT OBLIGATIONS UNDER THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER PARTY UNDER OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AGGREGATE AMOUNT PAID AND PAYABLE TO SERVICE PROVIDER BY CUSTOMER UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT THAT FIRST GIVES RISE TO SUCH LIABILITY. THIS LIMITATION SHALL APPLY EVEN IF THIS AGREEMENT OR ANY LIMITED REMEDY SPECIFIED IN THIS AGREEMENT IS DEEMED TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

11.     Intentionally Omitted.

12.     Term and Termination.

12.1    Term. This Agreement is effective as of the Effective Date set forth above and will continue for a one (1) year term or until terminated earlier as set forth below ("Term"). Either party may elect to terminate this Agreement by giving the other party thirty (30) days written notice at any time during the term. The parties may extend the Term upon mutual written consent of both parties.

4891-1790-8233.3

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

12.2    Termination by Customer. Customer may terminate this Agreement immediately for a breach by Service Provider if Service Provider's breach of any provision under this Agreement is not cured within thirty (30) business days after the date of Customer's written notice of breach.

12.3    Termination by Service Provider. Service Provider may terminate this Agreement immediately for a material breach by Customer if Customer's material breach of any provision of this Agreement is not cured within thirty (30) business days after the date of Service Provider's written notice of breach.

12.4    Effect of Expiration or Termination. Upon expiration or termination of this Agreement, Customer shall pay Service Provider for Services properly performed under this Agreement. The definitions contained in this Agreement and the rights and obligations contained in this Section and Sections 5 (Confidentiality), 6 (Ownership and Return of Confidential Information; Customer Property and Service Provider Property), and 1 (General Provisions) will survive any termination or expiration of this Agreement.

13.    General Provisions.

13.1    Successors and Assigns. Neither Service Provider nor Customer shall assign its rights or delegate any performance under this Agreement without the prior written consent of the other party except either party may assign this Agreement to a successor in interest in the event of a reorganization, merger, consolidation or sale of all or substantially all of such party's assets or stock. This Agreement will be for the benefit of each party's successors and assigns and will be binding on permitted assignees.

13.2    Notices. Any notice required or permitted by this Agreement shall be in writing and shall be delivered as follows, with notice deemed given as indicated: (a) by personal delivery, when actually delivered; (b) by overnight courier, upon written verification of receipt; (c) upon acknowledgment of receipt of electronic transmission; or (d) by certified or registered mail, return receipt requested, upon verification of receipt. Notice shall be sent to the addresses set forth above or to such other address as either party may provide in writing.

13.3    Governing Law; Forum. The laws of the United States of America and the State of California govern all matters arising out of or relating to this Agreement without giving effect to any conflict of law principles. Additionally, notwithstanding anything in the foregoing to the contrary, a claim for equitable relief arising out of or related to this Agreement may be brought in any court of competent jurisdiction. If a proceeding is commenced to resolve any dispute that arises between the parties with respect to the matters covered by this Agreement, the prevailing party in that proceeding is entitled to receive its reasonable attorneys' fees, expert witness fees and out-of-pocket costs, in addition to any other relief to which that prevailing party may be entitled.

13.4    Severability. If a court of law holds any provision of this Agreement to be illegal, invalid or unenforceable, (a) that provision shall be deemed amended to achieve an economic effect that is as near as possible to that provided by the original provision and (b) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected.

13.5    Waiver; Modification. If either party waives any term or provision of this Agreement, such waiver shall not be effective unless it is in writing and signed by the other party. No waiver by a party of a breach of this Agreement shall constitute a waiver of any other or subsequent breach by the other party. This Agreement may be modified only by mutual written agreement of authorized representatives of the parties.

4

4891-1790-8233.3

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

13.6    Entire Agreement.  This Agreement constitutes the final and exclusive agreement between the parties relating to this subject matter and supersedes all agreements, whether prior or contemporaneous, written or oral, concerning such subject matter.

14.    Use of Trademarks.  Each party is hereby granted a non-sublicensable, non-transferable, non-exclusive right to use the other party's trade names, trademarks, service marks, and logos ("Marks") in furtherance of the Services under this Agreement. The license granted in this is expressly conditioned on the requirement that each party complies with any and all applicable laws and regulations pertaining to the other party's Marks and each party agrees to comply with the other party's trademark guidelines. Each party shall retain ownership and title to its Marks and neither party shall register, or attempt to register, in any country in the world, the other party's Marks.

15.    No use of Confluent Platform.  This Agreement does not include any licenses to use or access any Service Provider software, systems, or networks.  Should Customer wish such licenses and/or access, the parties will enter into a new agreement.

*[Signature Page Follows]*

5

4891-1790-8233.3

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

| "Service Provider" | "Slower" or "Customer" |
|---|---|
| CONFLUENT, INC. | SLOWER, LLC |

By: *Kong Phan*
DocuSigned by: 878D1193F6FF4CF...

Name: Kong Phan

Title: VP, Corporate Controller

By: *Rikin Shah*
DocuSigned by: 0479F72CF5AA46C...

Name: rikin shah

Title: manager



CONFLUENT
Legal Reviewed

4891-1790-8233.3

DocuSign Envelope ID: 8A5DD224-B5A8-4646-9131-60165809B43A

## Exhibit A

## PARTNER ENABLEMENT SERVICES

**Services Description**:
Enablement, joint marketing, technology information sharing with engineering team for select customers.


**Payment of Fees.**  Fee will be:


$ 350,000 Fee for each year of the Term (i.e. if the Term is extended for subsequent years)

Service Provider will invoice the first $350,000 upon execution of this Agreement. Invoices shall be due and payable thirty (30) days from issuance of the invoice. Invoices will be emailed to rikin@slower.ai.


**Customer Expenses.**  Customer will reimburse Service Provider for the following expenses incurred in connection with this Agreement upon receipt of proper documentation of those expenses from Service Provider **(describe expenses)**:  None

4891-1790-8233.3

# EXHIBIT 2

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB



## CONFLUENT SUBSCRIPTION AGREEMENT FOR MANAGED SERVICES

This Subscription Agreement for Managed Services ("Agreement") is made and entered into as of December 23th, 2019 ("Effective Date"), by and between Confluent, Inc. ("Confluent"), a Delaware corporation with offices at 101 University Avenue, Suite 111, Palo Alto, CA 94301, and Slower, LLC, a California limited liability company with offices at 3200 Park Center Drive, Suite #1400, Costa Mesa, CA 9262 ("Customer").

WHEREAS, Customer provides software solutions to its customers as a managed service (the "Solution") and desires to incorporate Confluent's proprietary software into one or more versions of the Solution, subject to the terms and conditions of this Agreement; and

WHEREAS, Confluent desires to license its proprietary software to Customer for use in the Solution and to provide Customer related support services, subject to the terms and conditions of this Agreement.

NOW THEREFORE, the parties agree as follows:

1.    **License, Support and Orders.**

1.1    Subscription. Customer's subscription includes Support Services and a license to Confluent Software, as described below.

1.2    License Terms. Subject to the terms of this Agreement and one or more executed Order Forms, Confluent grants to Customer a limited, non-exclusive, non-sublicensable, non-transferable license during the applicable Term to install and use Confluent's proprietary software (together with any Modifications, collectively "Confluent Software") solely as necessary to incorporate the Confluent Software into the Solution (any version of the Solution that incorporates Confluent Software is referred to herein as the "Customer Product"). For clarity, no right to use or distribute Confluent Software outside of Customer Product is granted hereunder. Only Customer's employees and third-party contractors who are reasonably required to access the Confluent Software in connection with Customer's exercise of its rights and obligations under this Agreement may access the Confluent Software. Any employee and/or third-party contractor who accesses or uses the Confluent Software must be bound by a written agreement materially consistent with, and at least as protective of Confluent's Confidential Information, and the Confluent Software, as this Agreement. Customer shall be liable for any breach of this Agreement by its employees and/or third-party contractors.

Source Code. Within thirty (30) days of the date of this Agreement, Confluent shall deposit an with a third party escrow company ("Escrow Agent") a complete copy of the most current version

Page **1** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

of the source code for the Confluent Software and all programmer notes for the Confluent Software to the extent described in the Escrow Agreement (the "Deposited Materials"). The Deposit Materials shall be deposited pursuant to an escrow agreement between Confluent and the Escrow Agent (the "Escrow Agreement"). Customer shall have the right to become a beneficiary to the Escrow Agreement by executing an enrollment form with the escrow company and paying the applicable fees. The Escrow Agreement shall provide that the Escrow Agent shall release the version of the Deposit Materials that is under a current active subscription to enrolled beneficiaries if there is a Release Event. "Release Event" shall mean the existence of any one or more of the circumstances described in the Escrow Agreement and which may include in concept: (i) Confluent's entry of an order for relief under Title 11 of the United States Bankruptcy Code; (ii) Confluent's ceasing to do business in the ordinary course or failing to provide maintenance and support of the Component System; (iii) the making by Confluent of a general assignment for the benefit of creditors; (iv) the appointment of a general receiver or trustee in bankruptcy of Confluent's business or property; or (v) action by Confluent under any state or federal insolvency or similar law for the purpose of its bankruptcy, reorganization, or liquidation. If there is a conflict between this section ("Source Code") and that of the Escrow Agreement, the terms of the Escrow Agreement shall control; except that the parties agree that Confluent hereby grants a license to Customer to use, reproduce and modify for the purposes of maintenance the Deposited Material pursuant to the terms of the Escrow Agreement and provided further that Customer will not receive such Deposited Materials or exercise such license unless and until there is a Release Event.

1.3     Distribution of Customer Product. Customer is permitted to distribute Customer Product to ███████████████████████ to the extent and for the Term stated in the a fully executed Order Form (each an "End Customer") Customer is not permitted to appoint a sub-distributor for the Customer Product. Prior to receiving Customer Product, each End Customer must accept (or have accepted) terms and conditions at least as protective of Confluent and the Confluent Software as those herein; Customer shall be solely responsible for any liability incurred by it or Confluent resulting from Customer's failure to include such terms in its agreements with End Customers. Confluent shall have no obligations or liabilities to End Customers directly; *provided*, that the foregoing shall not be construed to diminish Confluent's obligations under Section 4 (Confidentiality).

1.4     Additional Restrictions on Use. Customer shall not, and shall not permit or encourage any third party (including End Customer) to: (a) use the Confluent Software for third-party training, software-as-a-service, time-sharing or service bureau use, or (b) disassemble, decompile or reverse engineer any portions of the Confluent Software that are not provided in source code format, or otherwise gain access to the source code to such Confluent Software (or the underlying algorithms, structure or organization of the object code in the Confluent Software or other Confidential Information of Confluent incorporated therein). The foregoing restriction is inapplicable to the extent prohibited by applicable law; provided that, in the event that Customer intends to disassemble, decompile or reverse engineer the Confluent Software, Customer shall first provide Confluent with written notice thereof.

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

1.5     Customer Covenants. Customer agrees to: (i) conduct business in a manner that reflects favorably on the Confluent Software, and the good name, good will and reputation of Confluent; (ii) avoid deceptive, misleading or unethical practices that are detrimental to Confluent and the Confluent Software; (iii) make no false or misleading representations with regard to Confluent and Confluent Software; (iv) not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to Confluent and Confluent Software; (v) make no representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of the Confluent Software that are inconsistent with the documentation provided by Confluent; and (vi) comply with all applicable laws with respect to the Confluent Software and its performance under this Agreement.

1.6     Copies. Section 1.2 includes the right for Customer to make copies of the Confluent Software as necessary to exercise the licenses granted in Section 1.2, and a reasonable number of back-up or archival copies, provided that each such copy shall include Confluent's copyright and any other proprietary notices that appear on the original copies of the Confluent Software.

1.7     Confluent Audit Rights. Confluent reserves the right, upon thirty (30) business days' notice to Customer, to audit, during normal business hours, at Customer's premises Customer's written records relating solely to usage of the Confluent Software solely to verify Customer's compliance with the terms of this Agreement; *provided*, that the audit shall be conducted by an independent licensed accountant ("Auditor") approved by Customer, such approval not to be unreasonably withheld or delayed' *provided further*, such audit right shall not be exercised more than once per calendar year; *provided further*, that all audits shall be subject to applicable laws; and *provided further* that the Auditor executes Customer's Confidential Information Agreement. Any information obtained pursuant to any audit performed in accordance with the audit and provided by the Auditor to Confluent shall be treated by Confluent as Customer Confidential Information. The Auditor's findings will be disclosed to Customer first in order to give Customer the opportunity to discuss and comment upon the findings directly with the Auditor before such findings are shared with Confluent. Without limiting the foregoing, Customer shall assist the Auditor in good faith to verify that the number of instances of Confluent Software used in connection with the Customer Product by End Customers' thereof corresponds to the number of instances of Confluent Software specified in then active Order Forms and verified by running internal assessments of usage, the results of which shall be summarized and shared with Confluent at Confluent's reasonable request. Such audit shall be at Confluent's expense. If the audit determines that any fees are due from Customer to Confluent under the terms of this Agreement, Customer shall pay any such undisputed amounts due; and if such amount exceeds ten percent (10%) of the cumulative fees previously paid under this Agreement, Customer shall reimburse Confluent for the reasonable and documented cost of such audit.

1.8     Reservation of Rights. Confluent reserves all rights not expressly granted in this Section. No rights are granted by implication.

1.9     Delivery of Materials. The Confluent Software, and any versions, updates or maintenance releases of any component thereof, will be delivered only through an electronic

Page 3 of 22

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

transfer. The parties shall reasonably cooperate to effectuate such delivery via FTP or other reasonable means.

1.10 Support Services. As part of Customer's subscription, Confluent shall provide the support and maintenance services specified in the applicable Order Form ("Support Services"). Support Services are provided to Customer only; Customer is solely responsible for supplying support and maintenance services to its End Customers.

1.11 Training Services. Customer will ensure that at least one (1) employee has completed Confluent's developer training, one (1) employee has completed Confluent's operations training, one (1) employee has completed Confluent stream processing training and one (1) employee has completed Confluent advanced skills for optimizing Kafka training each as further described on the first Order Form, throughout the Term; *provided*, that Customer shall use commercially reasonable efforts to ensure such initial training by its designated employee(s) shall be completed no later than forty-five (45) days following the Effective Date; *provided further*, that in the event Customer's designated employee(s) shall not be able to complete such training by such date, Customer shall notify Confluent thereof. Customer may elect to receive the developer training through self-paced online training (SPOT) free of charge, where available. Customer may purchase training for an additional fee at: https://www.confluent.io/training. All public training courses are subject to the Public Training Terms and Conditions located at: https://www.confluent.io/public-training-terms. Further, Confluent will require that Customer will maintain at least one (1) person who maintains a Confluent Certification Developer for Apache Kafka (CCDAK) designation (https://www.confluent.io/certification/).

1.12 Orders. The parties may execute orders substantially in the form of Exhibit A (each an "Order Form"). The initial Order Form is attached as Exhibit A. For clarity, neither party shall be obligated to execute any additional Order Forms.

2.    **Fees, Taxes, and Payment Terms.**

2.1 Fees. Customer shall pay Confluent the fees in the amount set forth in the applicable Order Form ("Fees") in accordance with the Order Form terms.

2.2 Taxes. Customer shall, in addition to the other amounts payable under this Agreement, pay all applicable customs, duties, sales, use, value added, withholding, or other taxes, federal, state or otherwise, however designated, which are levied or imposed because of the Fees payable to Confluent under Section 2.1 pursuant to Order Forms as contemplated by this Agreement, excluding taxes based on Confluent's income. If Customer is compelled to make a deduction or set-off for any such taxes, it will pay to Confluent such additional amounts as are necessary to ensure receipt by Confluent of the full amount Confluent would have received pursuant to Section 2.1 but for the deduction.

2.3 Payment Terms. Except as otherwise set forth in the applicable Order Form, all amounts payable to Confluent under this Agreement will be due within sixty (60) days from the

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

date of Customer's receipt of an invoice. In addition, Confluent reserves the right to immediately suspend Customer's license to the Confluent Software upon forty-five (45) days' prior written notice to Customer for any failure by Customer to pay any undisputed amount due and payable hereunder in accordance with this Section.

**3.     Ownership.** Customer acknowledges that Confluent or its licensors retain all proprietary rights, title and interest, including all intellectual property rights, in and to the Confluent Software and any changes, corrections, bug fixes, enhancements, updates and other modifications thereto (collectively, "Modifications"), and as between the parties all such rights shall vest in Confluent. Customer acknowledges that the licenses granted in Section 1.2 do not include the right for Customer to prepare any Modifications of the Confluent Software. Confluent acknowledges that Customer or its licensors shall retain all proprietary rights, title and interest, including all intellectual property rights, in and to the Solution and any changes, corrections, bug fixes, enhancements, updates and other modifications thereto, and as between the parties all such rights shall vest in Customer. The parties acknowledge and agree that no license, rights of access or use, or other rights, title, or interest are granted expressly, by implication, or otherwise in or to the Solution or Customer Product to Confluent under this Agreement.

**4.     Confidentiality.**

4.1     Nondisclosure and Limited Use. Each party shall retain in confidence the non-public information and know-how disclosed or made available by the other party pursuant to this Agreement which is either designated in writing as proprietary and/or confidential, if disclosed in writing, or if disclosed orally, is designated in writing (which may be via email) as confidential within thirty (30) days of the oral disclosure or otherwise should reasonably be understood to be confidential by the recipient ("Confidential Information"). The Confluent Software, and Modifications shall be Confluent's Confidential Information regardless of whether marked as such. The Customer Solution is Customer's Confidential Information regardless of whether marked as such. The terms and conditions of this Agreement shall be deemed the Confidential Information of both parties hereto. Without limiting the foregoing, any information relating to Customer's business, business relationships, software, trade secrets, products, services, designs, technology, processes, technical data, know-how, methods of transacting business, operations, suppliers, agents, representatives or End Customers shall be deemed the Confidential Information of Customer. Each party agrees to: (a) maintain the confidentiality of the other party's Confidential Information; (b) refrain from using the other party's Confidential Information except for the purpose of performing its obligations, or exercising its rights, under this Agreement; and (c) not disclose such Confidential Information to any third party except to employees and subcontractors as is reasonably required in connection with the exercise of its rights and obligations under this Agreement (and only subject to binding written use and disclosure restrictions at least as protective as those set forth herein which the receiving party agrees to enforce). Each party shall immediately notify the other party of its knowledge of any unauthorized disclosure or use of any Confidential Information and assist the other party in remedying such unauthorized use or disclosure by taking such steps as are reasonably requested by such other party. The foregoing obligations will not apply to Confidential Information of the other party which is: (i) already publicly known without

Page **5** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

breach of this Agreement; (ii) discovered or created by the receiving party without use of, or reference to, the Confidential Information of the disclosing party, as shown in records of the receiving party; or (iii) otherwise known to the receiving party with no confidentiality obligation and through no wrongful conduct of the receiving party. A disclosure by of any Confidential Information (a) in response to a valid  court order or other governmental body; (b) as otherwise required by law; or (c) necessary to establish the rights of either party under this Agreement shall not be considered to be a breach of this Agreement; provided that the receiving party shall provide prompt notice thereof and reasonable assistance to the disclosing party to enable the disclosing party to seek a protective order or otherwise prevent or restrict such disclosure. Moreover, either party hereto may disclose any Confidential Information hereunder to such party's agents, attorneys and other representatives (and only subject to confidentiality obligations at least as protective as those set forth herein which the receiving party agrees to enforce).

4.2     <u>Remedies</u>. Any breach or threatened breach of this Section may cause irreparable injury to the disclosing party and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the disclosing party shall be entitled to seek injunctive relief against the threatened breach of this Agreement or the continuation of any such breach by the receiving party, without the necessity of posting any bond, in addition to any other rights or remedies provided by law.

## 5.     Limited Warranty.

5.1     <u>Scope of Limited Warranty</u>. Confluent warrants to Customer that for a period of ninety (90) days after the first delivery of the Confluent Software by Confluent to Customer, the Confluent Software in the form delivered by Confluent to Customer, will perform substantially in accordance with the written documentation therefor. This limited warranty shall not apply if the Confluent Software has been: (i) altered or modified except as combined with Customer's Solution; (ii) subjected to negligence; or (iii) used, adjusted, installed or operated (A) other than in accordance with this Agreement or the instructions furnished by Confluent in writing or (B) with an application or in an environment other than that intended or recommended by Confluent as set forth in the written documentation for the Confluent Software. The foregoing warranty shall not apply to End Customers and Customer shall not pass through such warranty to End Customers.

5.2     <u>Exclusive Remedy</u>. Confluent's sole liability and Customer's exclusive remedy under the limited warranty set forth above will be, at 's Confluent's election, (i)  to correct any failure of the Confluent Software to materially conform to its written documentation or (ii) to replace the non-conforming software or (iii) refund Fees. The above remedy is available only if (a) discovery of the non-conformity occurs during the applicable warranty period and (b) Customer notifies Confluent in writing by Customer of such discovery within the warranty period.

5.3     <u>Disclaimer of Any Other Warranties</u>. EXCEPT FOR THE EXPRESS, LIMITED WARRANTY PROVIDED IN THIS SECTION 5, CONFLUENT MAKES NO WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, WITH RESPECT TO THE CONFLUENT SOFTWARE OR ANY OTHER MATERIALS OR SUPPORT SERVICES

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

PROVIDED HEREUNDER. CONFLUENT SPECIFICALLY DISCLAIMS ALL OTHER WARRANTIES, EXPRESS AND IMPLIED, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT AND THOSE ARISING FROM A COURSE OF DEALING OR USAGE OR TRADE, AND ALL SUCH WARRANTIES ARE HEREBY EXCLUDED TO THE FULLEST EXTENT PERMITTED BY LAW. EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE CONFLUENT SOFTWARE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.

5.4    Disabling Code. During the warranty period set forth in Section 5.1, Confluent warrants that the Confluent Software, as delivered, will not purposefully contain any virus, worm, trap door, back door, timer, clock, counter or other limiting routine, instruction or design that would erase data or programming or otherwise cause the Solution to become inoperable (collectively, a "Disabling Code"). In the event a Disabling Code is identified, then Confluent shall, upon receipt of written request from Customer, and as Customer's sole and exclusive remedy for Confluent's violation of this Section 5.4 warranty, take all steps necessary, at no additional cost or expense to Customer, to furnish to Customer a new copy of the Confluent Software without the presence of Disabling Codes and assist in the installation and implementation of such new copy of the Confluent Software.

6.    **Infringement Indemnification.** Confluent, at its own expense, shall defend, indemnify, and hold harmless Customer from and against all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, and other expenses (including without limitation reasonable attorneys' fees, disbursements, and court costs) (collectively, "Losses") arising from any claim, demand, lawsuit or other action brought by any third party alleging infringement by the Confluent Software of a third party intellectual property right, and will pay such Losses attributable to such action,  provided that Customer will (a) notify Confluent promptly in writing of any such action; (b) give Confluent sole control of the defense or settlement of such action; *provided*, that Confluent shall obtain Customer's prior written approval, not to be unreasonably denied, with respect to the terms of such settlement, and Confluent may not settle or defend any such claim unless it unconditionally releases Customer of all liability and admission of wrongdoing and (c) give Confluent all reasonable information and assistance to the extent necessary for such defense, at Confluent's expense. Should the Confluent Software become, or in the opinion of Confluent be likely to become, the subject of such an infringement claim, Confluent shall immediately notify Customer thereof and, at 's Confluent's option, either: (i) procure for Customer the right to use the allegedly infringing element of the Confluent Software, at no charge to Customer; (ii) replace or modify, in whole or in part, the Confluent Software to make it non-infringing *provided* such replacement or modification provides substantially the same functionality and performance as the infringing item; or (iii) accept return of the Confluent Software, or remove the allegedly infringing module thereof, and, refund a pro rata portion of the Fees paid by Customer for the then-current Term. Confluent assumes no liability hereunder for any claim of infringement to the extent based on: (w) use of software other than a current unaltered release of the Confluent Software, as provided by Confluent to Customer; (x) the combination, operation or use of the

Page 7 of 22

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

Confluent Software, with non-Confluent programs or hardware other than combination with Solution and only to the extent where Confluent Software would not infringe but for the combination with Solution, (y) any alteration or modification of the Confluent Software by Customer where the Confluent Software would not have infringed but for the alteration or modification  or (z) open source software as disclosed in the terms of Section 10.3. THIS SECTION 6 SETS FORTH CONFLUENT'S ENTIRE LIABILITY AND OBLIGATION, AND CUSTOMER'S SOLE REMEDY, HEREUNDER FOR ANY CLAIM OF INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS TO THE EXTENT RELATING TO CONFLUENT SOFTWARE.

7.    **Customer Indemnification**.  Customer shall defend, indemnify, and hold Confluent harmless against any Losses incurred in connection with claims made or brought against Confluent by a third party (including but not limited to an End Customer) to the extent (but only to the extent) relating to any component(s) of the Customer Product that are not Confluent Software (collectively, "Non-Confluent Components"), including (a) claims relating to an End Customer's use of such Non-Confluent Components of the Customer Product, or (b) claims alleging the Non-Confluent Components of the Customer Product infringe the intellectual property rights of a third party or (c) claims alleging the combination of Confluent Software with the Solution infringes the rights of a third party to the extent due to such combination. Confluent will (x) promptly give written notice of any such claim to Customer; (y) give Customer sole control of the defense and settlement of the such claim (provided that Customer may not settle or defend any such claim unless it unconditionally releases Confluent of all liability relating thereto); and (z) provide to Customer, at Customer's cost, all reasonable assistance with respect to such claim.

8.    **Limitation of Liability.** EXCEPT FOR BREACH OF SECTION 1.2, 1.3 OR 1.4, FEES PAYABLE HEREUNDER, OR BREACH OF SECTION 4, AND INDEMNIFICATION OBLIGATIONS:

(A) IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING UNDER THIS AGREEMENT EXCEED THE AMOUNT PAID OR PAYABLE BY CUSTOMER TO CONFLUENT UNDER THIS AGREEMENT DURING THE TWELVE (12) MONTHS IMMEDIATELY PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY; AND NOTWITHSTANDING THE FOREGOING, CUSTOMER'S AGGREGATE INDEMNITY LIABILITY SHALL BE LIMITED TO FIVE MILLION DOLLARS, AND

(B) NEITHER PARTY WILL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL, INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, BUSINESS, CONTRACTS, REVENUE, GOODWILL, PRODUCTION, ANTICIPATED SAVINGS, LOSS OF DATA, OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, OR FOR ANY CLAIM OR DEMAND BY ANY OTHER PARTY, HOWEVER CAUSED AND (TO THE FULLEST EXTENT PERMITTED BY LAW) UNDER ANY THEORY OF LIABILITY (INCLUDING NEGLIGENCE) EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

THESE LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

## 9.    Term and Termination.

9.1    Term. Unless earlier terminated as provided in this Section, this Agreement is effective as of the Effective Date and will continue until the expiration or termination of the Subscription Term of all Order Form. Each Order Form will specify the subscription term ("Subscription Term").

9.2    Termination. Either party may terminate this Agreement and any Order Form upon breach by the other party of any material obligation under this Agreement which has not been cured within thirty (30) days after providing written notice of such breach to the other party. Either party may also terminate this Agreement immediately if the other party: (a) terminates or suspends its business; (b) becomes subject to any bankruptcy or insolvency proceeding under Federal or state statute and such proceedings are not dismissed within thirty (30) days; (c) becomes insolvent or subject to direct control by a trustee, receiver or similar authority; or (d) has wound up or liquidated, voluntarily or otherwise.   Customer may also terminate this Agreement on thirty (30) days prior written notice to Confluent if Customer's End Customer terminates its agreement with Customer, provided that there will be no refund to Customer of any fees paid or payable as of the termination date to Confluent under any Order Forms as a result of such termination.

9.3    Effect of Licensor Bankruptcy. All rights and licenses granted by Confluent to Customer and its Affiliates under this Agreement are and shall be deemed to be rights and licenses to "intellectual property," and the subject matter of the Agreement, including all Confluent Software, documentation and other deliverables, are and shall be deemed to be "embodiment[s]" of "intellectual property," for purposes of and as such terms are used in and interpreted under section 365(n) of the United States Bankruptcy Code (the "Code") (11 U.S.C. § 365(n)). Customer and its Affiliates shall and do hereby have the right to exercise all rights and elections under the Code and all other applicable bankruptcy, insolvency and similar laws with respect to this Agreement and the subject matter hereof.  Without limiting the generality of the foregoing, Confluent acknowledges and agrees that, if Confluent or its estate shall become subject to any bankruptcy or similar proceeding, all rights and licenses granted to Customer and its Affiliates under this Agreement (including any applicable, duly executed Order Form) will continue subject to the terms and conditions hereof, and will not be affected, even by Confluent's rejection of the Agreement.

9.4    Effect of Termination. The rights and obligations of Confluent and Customer in Sections 1.8 (Confluent Audit Rights) for one (1) year from termination, 1.8 (Reservation of Rights), 2 (Fees, Taxes, and Payment Terms), 3 (Ownership), 4 (Confidentiality), 5.3 (Disclaimer of Any Other Warranties), 6 (Infringement Indemnification), 7 (Customer Indemnification), 8 (Limitation of Liability), 9.4 (Effect of Termination), and 10 (Miscellaneous) shall survive termination of this Agreement. In the event of any termination of the Agreement, Confluent shall continue to allow Customer's use of the Confluent Software and to provide Customer's End Users

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

use of Customer Product for the longer of (i) twelve (12) months following the date of such termination or expiration and (ii) the remainder of the period of time for which Customer is obligated to provide the Customer Product using the Confluent Software (the "Transition Period") on the same terms and conditions in effect as of such expiration or termination, including fees and pricing terms. In addition, Confluent shall provide to Customer information and termination assistance as reasonably requested by Customer, subject to Confluent's standard fees for professional services.

9.5     Nothing contained herein shall limit any other remedies that either party may have for the default of the other party under this Agreement nor relieve such defaulting party of any of its obligations incurred prior to such termination.

**10.     Miscellaneous.**

10.1     Assignment. Each party shall have the right to assign this Agreement to (i) its Affiliate or (ii) any successor to its business or assets to which this Agreement relates, whether by merger, sale of assets, sale of stock, reorganization or otherwise; provided, that the assigning party shall notify the non-assigning party within thirty (30) days thereof.    Any other purported transfer or assignment of, or delegation of rights under, this Agreement shall be null and void and of no force or effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective successors and permitted assigns.

10.2     Entire Agreement; Modification; Waiver. This Agreement, together with its exhibits and Order Forms, represents the entire agreement between the parties, and supersedes all prior agreements and understandings, written or oral, with respect to the matters covered by this Agreement, and is not intended to confer upon any third party any rights or remedies hereunder. Each party acknowledges that it has not entered in this Agreement based on any representations other than those contained herein. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing and signed by both parties. Any different or additional terms of any Customer purchase order or confirmation even if signed by the parties shall have no force or effect. The waiver of one breach or default or any delay in exercising any rights shall not constitute a waiver of any subsequent breach or default.

10.3     Third Party Software.  Confluent also makes available certain third party open source software as identified at http://www.confluent.io/third_party_software ("Third Party Software"). The Third Party Software shall be subject to the applicable open source license(s) and not this Agreement, and is provided by Confluent at no charge. Confluent makes no warranties, express or implied, and will not be obligated under Section 6 with respect to any Third Party Software. To the extent the terms of open source licenses applicable to Third Party Software prohibit any of the restrictions in this Agreement, such restrictions will not apply to such Third Party Software. To the extent the terms of open source licenses applicable to Third Party Software require Confluent to make an offer to provide source code or related information in connection with the Third Party Software, such offer is made.

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

10.4    Delays. In the event that either party is prevented from performing or is unable to perform any of its obligations under this Agreement (other than any payment obligation) due to any Act of God, fire, casualty, flood, earthquake, war, strike, lockout, epidemic, destruction of production facilities, riot, insurrection, material unavailability, or any other cause beyond the reasonable control of the party invoking this Section 10.4, and if such party shall have used its commercially reasonable efforts to mitigate its effects, such party shall give prompt written notice to the other party, and the time for the performance shall be extended for the period of delay or inability to perform due to such occurrences.

10.5    Governing Law. This Agreement shall in all respects be governed by the laws of the State of California without reference to its principles of conflicts of laws. The parties hereby agree that all disputes arising out of this Agreement shall be subject to the exclusive jurisdiction of and venue in the federal and state courts located in Santa Clara County, California. Customer hereby consents to the personal and exclusive jurisdiction and venue of these courts. The parties hereby disclaim and exclude the application hereto of the United Nations Convention on Contracts for the International Sale of Goods.

10.6    Severability. If any provision of this Agreement is held invalid or unenforceable under applicable law by a court of competent jurisdiction, it shall be replaced with the valid provision that most closely reflects the intent of the parties and the remaining provisions of the Agreement will remain in full force and effect.

10.7    Relationship of the Parties. Nothing in this Agreement is to be construed as creating an agency, partnership, or joint venture relationship between the parties hereto. Neither party shall have any right or authority to assume or create any obligations or to make any representations or warranties on behalf of any other party, whether express or implied, or to bind the other party in any respect whatsoever. Each party may identify the other as a customer or supplier, as applicable.

10.8    Notices. All notices permitted or required under this Agreement shall be in writing and shall be deemed to have been given when delivered in person (including by overnight courier), or three (3) business days after being mailed by first class, registered or certified mail, postage prepaid, to the address of the party specified in this Agreement or such other address as either party may specify in writing.

10.9    Export Law Assurances. Customer understands that the Confluent Software is subject to export control laws and regulations. Customer may not download or otherwise export or re-export the Confluent Software or any underlying information or technology except in full compliance with all applicable laws and regulations, including United States export control laws. None of the Confluent Software or any underlying information or technology may be downloaded or otherwise exported or re-exported: (a) into (or to a national or resident of) any country to which the United States has embargoed goods; or (b) to anyone on the U.S. Treasury Department's list of specially designated nationals or the U.S. Commerce Department's list of prohibited countries or debarred or denied persons or entities. Customer hereby agrees to the foregoing and represents

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

and warrants that customer is not located in, under control of, or a national or resident of any such country or on any such list.

10.10    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

10.11    Construction. The titles and section headings used in this Agreement are for ease of reference only and shall not be used in the interpretation or construction of this Agreement. No rule of construction resolving any ambiguity in favor of the non-drafting party shall be applied hereto. The word "including", when used herein, is illustrative rather than exclusive.

10.12    Affiliates. "Affiliate" means, with respect to a party hereto, any entity or person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such party. For purposes of this definition, "control" (and, with correlative meanings, the terms "controlled by" and "under common control with") means: (i) the possession, directly or indirectly, of the power to direct the management or policies of a business entity, whether through the ownership of voting securities, by contract relating to voting rights or corporate governance or otherwise; or (ii) the ownership, directly or indirectly, of at least 50% of the voting securities or other ownership interest of a business entity (or, with respect to a limited partnership or other similar entity, its general partner or controlling entity). The parties agree that Customer's Affiliates may also conduct business under this Agreement by entering into Order Forms, subject to the terms and conditions set forth in this Agreement. Accordingly, when any applicable Affiliate of Customer conducts business hereunder, references to Customer shall include such Affiliate. The parties agree that when an Affiliate of Customer enters into an Order Form, such Affiliate shall be solely responsible for performing all of its obligations under this Agreement in connection with such Order Form. Notwithstanding the foregoing, the parties agree that for purposes of this Agreement only the following entities (such entities, "Approved Customer Affiliates") shall be considered Customer's Affiliates: **[LIST ENTITIES]**. Customer may add additional Affiliates as Approved Customer Affiliates subject to Confluent's written approval, which will not be unreasonably withheld.

10.13    Anti-Corruption, Anti-Bribery Laws. Each party agrees that it shall comply fully with all applicable anti-corruption and anti-bribery laws, including, but not limited to, the United States Foreign Corrupt Practices Act and the United Kingdom Bribery Act (as applicable). Without limiting the generality of the foregoing obligation, each party agrees that it shall not make, authorize, offer, or promise to make, or give any money or any other thing of value, directly or indirectly, to any government official or employee, political party, or candidate for political office for the purpose of securing any improper or unfair advantage or obtaining or retaining business in connection with the activities contemplated hereunder. Any breach or violation of any provision contained in this Section 10.13 by a party shall be grounds for immediate termination of this Agreement by the other party.

10.14    Legal and Corporate Authority. Each party represents and warrants that it: (a) is qualified and registered to transact business in all locations where the performance of its

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

obligations hereunder would require such qualification; (b) has all necessary rights, powers and authority to enter into and perform this Agreement, and its execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action; (c) its execution and performance of this Agreement shall not violate any law and shall not breach any agreement, covenant, court order, judgment or decree to which it is a party or by which it is bound; and (d) has, and promises that it shall maintain in effect, all governmental licenses and permits necessary, and comply with all applicable laws, in connection with its execution and performance of this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives.

**CONFLUENT, INC.**                    **SLOWER, LLC**

Signature: *Michael Poutre*            Signature: *Rikin Shah*
DocuSigned by:                         DocuSigned by:
A7BE4776E18A493...                     0479F72CF5AA46C...

Name: Michael Poutre                   Name: Rikin Shah

Title: VP of Finance                   Title: CEO

Date: 12/24/2019 | 8:14 AM PST         Date: 12/24/2019 | 5:50 AM PST

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

**Exhibit A**

**Confluent, Inc.
ORDER FORM**

This order form including the attachments hereto and all documents incorporated into this order form by reference herein ("Order Form") commences on the date of the last signature below ("Order Form Effective Date") and is between Confluent, Inc., a Delaware corporation ("Confluent") at 101 University Ave, Suite 111, Palo Alto, CA 94301 and _____ ("Customer"). This Order Form is subject to and made part of the Confluent Subscription Agreement for Managed Services between the parties dated December 23, 2019 ("Agreement"). All capitalized terms not otherwise defined in this Order Form will have the meanings assigned to them elsewhere in the Agreement.

| |
|---|
| Customer Name: Slower, LLC ("Customer") |
| Customer Bill-to Name (if different): |
| Billing Address: |
| |
| Billing Contact: |
| Billing Phone Number: |
| Billing Email Address: |

## 1.    END CUSTOMER DETAILS AND ADDITIONAL TERMS

**End Customer:**

| | |
|---|---|
| End Customer Name | ▓▓▓▓▓▓ |
| End Customer Address | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| End Customer Contact Name | ▓▓▓▓▓ |
| End Customer Phone Number | |
| End Customer email Address | ▓▓▓▓▓▓▓▓ |

**Territory**: Worldwide

Page **14** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

## 2.    ORDERED PRODUCTS AND FEES

### A. Confluent Platform Subscription

Customer is hereby ordering a three-year subscription to the Confluent Platform as described in the table below. Such subscription consists of a license to the Confluent Software plus Support Services for the Confluent Platform, as set forth in the tables below.

| Subscription Fee Schedule | | | | | |
|---|---|---|---|---|---|
| Product Description | Subscription | Unit of Measure | Quantity | Unit Fee (annual) | Subscription Term Fee |
| Confluent Platform Subscription Gold | Year 1 | Production Node | 300 | $3333,333 | $999,999.00 |
| Confluent Platform Subscription Gold | Year 2 | Production Node | 400 | $2,500.00 | $1,000,000.00 |
| Confluent Platform Subscription Gold | Year 3 | Production Node | 500 | $2,000.00 | $1,000,000.00 |
| Total Fees for Subscription Term ("Subscription Fees"): | | | | | USD $2,999,999.00 |

Subject to payment of all fees payable as set forth herein, the Subscription Start Date for the End Customer will be February 1, 2020.

Confluent Software licensed under this Order Form consists of:

Commercial features:
Control Center                    Replicator
Auto Data Balancer                JMS Client
Security Plugins                  Confluent Support Metrics
MQTT Proxy                        Connectors

Community features (in the object code form provided by Confluent):
KSQL                              Schema Registry
REST Proxy                        Connectors

Confluent also makes the community feature software available under the Confluent Community License, and Customer's rights under such license with respect to such software shall not be limited by the terms of the Agreement.

The Subscription Fees are based on the number of Nodes (defined below). Customer may not use the Confluent Platform on a quantity of Nodes that exceeds the quantity it has purchased.

Page **15** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

"Node" means each software instance of a Confluent Platform component (identified below) running on a physical or virtual computing machine that does not exceed any of the following elements:

- 40 processing cores or virtual cores
- 24 hard drives
- 50 TB total hard drive capacity
- 12 TB total flash or SSD capacity
- 256 GB of RAM.

As used above, "Confluent Platform component" means any of the following:

- Kafka broker
- Replicator (Kafka Connect worker)
- Control Center
- REST Proxy
- MQTT Proxy

- Zookeeper
- Mirror Maker
- Schema Registry
- KSQL
- Kafka Connect worker

For the avoidance of doubt, a Node does not include an application that uses only the client API (i.e., Kafka Producer/Consumer).

A Node is classified as either "Production," "Pre-Production" or "Development."

- "Production" means use for any purpose other than the purposes specified below for Pre-Production and Development. A Production instance includes an instance that is running in standby mode, and excludes instances that are installed but not running.

- "Pre-Production" means use *solely* for QA, staging, end-user testing or other non-development pre-production purposes.

- "Development" means use *solely* by developers testing code, or use *solely* in a sandbox environment that is not accessed or in any way used by users of the production system.

*Support Services*

Confluent shall provide Customer the support and maintenance services set forth in the maintenance and support terms, which are posted at:
    Gold: https://www.confluent.io/maintenance-and-support-services-terms-gol/.

Customer is solely responsible for supplying support and maintenance services to End Customer, however Customer shall reference End Customer in all support and maintenance requests.

Page **16** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

Termination Period: Customer may terminate this Order Form any time before January 31, 2020 by providing written notice to Confluent without any penalty or payment obligations. If Customer does not provide Confluent with written notice of termination by such date, then this Order Form will remain in full force and effect and Customer will be obligated for all fees due and payable under the Order Form. Prior to January 31, 2020, the parties will work in good faith to amend this Order Form and the Agreement as necessary to align with terms as requested of Slower by the End Customer. If the parties are unable the come to agreement on such amendment, then this Order Form and the Agreement will be void and of no force or effect.

## B. Advisory Services

Customer is hereby ordering the advisory services listed below ("Advisory Services").

| Advisory Services Fees Schedule | | |
|---|---|---|
| Advisory Services Engagement | Quantity | Price |
| Resident Solution Architect * | 16 days | $66,880.00 |
| Total Advisory Services Fees: | | USD $66,880.00 |

*The Resident Solution Architect engagement will be delivered in accordance with the Services Description attached as Exhibit B.

Confluent's travel and related expenses incurred in performing the Advisory Services are included in the Advisory Services Fees unless otherwise specified herein.

## C. Training Services

Customer is purchasing the training course(s) (each, a "Course") listed below ("Training Services"):

| Training Services Fees Schedule | | |
|---|---|---|
| Course Name | Course Duration | Price |
| Training Credits: 225 | N/A | $ 21,375.00 |
| Total Training Services Fees: | | USD $ 21,375.00 |

Fees for the Training Services include up to 10 attendees ("Attendees") per Course. For any Courses other than Courses designated as "Public," Customer may add up to 5 additional Attendees (up to a maximum of 15 total Attendees) per Course for an additional fee per-Attendee.

Page 17 of 22

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

Training Course Coordination.  For any Courses other than Courses designated as "Public," Confluent will contact the designated Customer contact to arrange a mutually acceptable date for delivery of the Courses. All Courses must be scheduled within twelve (12) months of the Order Form Effective Date.

Training Credits.  Training credits must be redeemed within one year from the last signature date of this Order Form. Training credit amounts will be applied to scheduled training courses based on the then-current list price for such courses.  Training credits are non-refundable, non-transferable, and, notwithstanding any other language to the contrary in this Order Form, 100% of the fees will be invoiced upon the date of last signature below. Training credits may only be used for training and certification product SKUs.

## D.  Total Fees

The total fees due and payable under this Order Form for the Subscription Term ("Total Fees") are as follows:

| Total Fees: | |
| --- | --- |
| Subscription Fees | $2,999,999.00 |
| Advisory Services Fees | $68,880.00 |
| Training Services Fees | $21,375.00 |
| **Total Fees:** | **USD $3,088,254.00** |

Total Fees are payable in accordance with the Payment Terms section below.

## 3.  ADDITIONAL SERVICES TERMS

Confluent will provide Customer with the Advisory Services and/or Training Services purchased under this Order Form in accordance with this Order Form and the Supplemental Terms for Services Engagements posted at https://www.confluent.io/supplemental-services-terms, which are hereby incorporated into this Order Form by reference.  All Advisory and/or Training Services must be scheduled within one year of the Order Form Effective Date.

## 4.  PAYMENT TERMS

### A. Payment of Fees.

**Total Subscription.** The Total Fees of this order form will be invoiced as follows and are due and payable 75 days from invoice date. Except as set forth in the Termination Period section, payment obligations are non-cancelable and, except as expressly stated below, fees paid are non-refundable. Fees stated are exclusive of taxes.

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

*i)*

| | Amount | Invoice Date |
|---|---|---|
| Years 1 and 2 Fees | $ 2,373,654.00 | February 1, 2020 |
| Year 3 Remaining Fees | $ 714,600.00 | February 1, 2021 |

*ii)* **Advisory and Training Services Fees.** For Advisory Services and Training Services, a prepaid deposit of fifty percent (50%) of the applicable Fees is due and payable on the Order Form Effective Date to reserve the date(s) agreed upon by the parties. Prepaid Fees for Advisory Services and Training Services are non-refundable. The remaining balance of Fees will be invoiced monthly, in arrears, as the applicable Services are delivered. If there is any remaining balance of Fees as of the one-year anniversary of the Order Form Effective Date, such Fees will be invoiced and payable in full.

**5.    ORDER FORM VALIDITY**

The terms and pricing in this Order Form are offered by Confluent for a limited time. If Customer does not provide Confluent with an executed copy of this Order Form on or before December 31, 2019, Confluent reserves the right to reject the Order Form by notice to Customer.

In the event of a conflict between the terms of this Order Form and the terms in another part of the Agreement, the terms of this Order Form shall control, but only with respect to the specific products and services purchased hereunder.

| **CONFLUENT, INC.** | **SLOWER, LLC** |
|---|---|
| Signature: *Michael Poutre* | Signature: *Rikin Shah* |
| Name: Michael Poutre | Name: Rikin Shah |
| Title: VP of Finance | Title: CEO |
| Date: 12/24/2019 \| 8:14 AM PST | Date: 12/24/2019 \| 5:50 AM PST |

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

**EXHIBIT B**

**RESIDENT SOLUTION ARCHITECT**
**SERVICES DESCRIPTION**

1. **Scope of Services.** At Customer's direction, Confluent will provide Advisory Services supporting the Confluent Platform initiatives, consisting of any combination of the following activities:

   a. **Discovery.** Confluent will review, together with Customer, Customer's current state and desired technical end state of the Confluent Platform and related applications in order to inform Customer's requirements, roadmap, and business case.

   b. **Architectural Direction and Oversight.** Confluent will provide architectural guidance to the implementation of the Confluent Platform and advise on best practices as requested and directed by Customer.

   c. **Deployment.** Confluent may advise and support Customer as needed with setting up the Development or Pre-Production instance of the Confluent Platform. Customer will maintain deployment responsibility of the instance throughout the duration of the engagement.

   d. **Knowledge Sharing.** Confluent will provide the Customer team guidance as necessary regarding the Confluent Platform and its interaction with related tools or systems in order for Customer to plan the transition to the Confluent Platform. The information will be in the form of demonstrations and working sessions. Confluent will work with Customer to plan the approach to implementing the Confluent Platform and define a base set of requirements and tasks to guide the implementation of the Confluent Platform. In the last week of the engagement, Confluent will knowledge transfer a defined list of unknowns to the Customer team.

   For the avoidance of doubt, the above does not include configuration services, user training, or other services. Should Customer wish to purchase such additional services, the parties shall enter into a separate order.

   e. **Delivery Support Topics Discussed with Customer.** The following topics have been identified via discussions between Confluent and Customer as priority areas of investigation and support by Confluent resources.

      1. Use Case Design and Event Modeling: Review the use cases intended for the customer's Confluent environment and provide feedback and best practices.
      2. Infrastructure Design: Review the use case sizing and Service Level Agreements (SLAs) and provide feedback and best practices as it relates to the intended deployment infrastructure.
      3. Confluent Installation and Configuration: Review the intended use case and infrastructure and provide feedback and best practices regarding the installation and configuration of the Confluent software.

Page **20** of **22**

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

4. Security: conducting security reviews, provide feedback, and best practices as it relates to the Confluent Platform.

5. Testing: reviewing the strategy, planning, development and execution of Confluent test scripts.

6. Migration: reviewing the strategy, planning, and execution of migrating the Confluent-based solution to additional on-prem or cloud environments.

7. Upgrades: Reviewing the upgrade plan moving from open source to Confluent Platform and providing guidance around the upgrade.

8. Automation: Provide input into the automation strategy, planning, and execution.

9. Monitoring and logging: Review monitoring and logging strategies, planning, and execution related to the Confluent Platform.

10. Operations: Review the operations strategy and guide best practices.

2. **Customer Responsibilities**

   a. Provide access to the Confluent environments for review.

   b. Provide test data for test scripts.

   c. Upon or before commencement of the Advisory Services, Customer will provide any applicable documentation of requirements, designs, and constraints that may be required by Confluent to undertake the Advisory Services.

   d. Customer will provide Confluent with access to all offices and systems required by Confluent to perform the Advisory Services. Confluent agrees to comply with such reasonable written security procedures as Customer may establish and provide to Confluent prior to the provision of Advisory Services.

   e. Confluent will manage the schedule for the tasks assigned to Confluent resources. Except for those tasks, Customer is expected to manage all schedules, including milestones and dependencies for stakeholders and other Customer teams.

3. **Assumptions**

   a. Advisory Services will begin on a date mutually agreed by Customer and Confluent. Services will be scheduled and delivered over a 4-day work week (either Monday-Thursday or Tuesday-Friday), not to exceed eight (8) hours per day, up to the quantity of days purchased by Customer.

   b. Confluent and Customer may mutually agree to run multiple initiatives in parallel, requiring concurrent weeks of the Resident Architect offering.

   c. Confluent will work under the direction of Customer and Customer acknowledges that Advisory Services may be transitioned as work-in-progress and not as completed deliverables.

Page **21** of **22**

786\3328185.8

DocuSign Envelope ID: 55E69986-3FC2-4F62-BF83-686C5ABAD8DB

d.  Customer will be responsible for the reasonable and documented travel and living expenses ("Expenses") incurred by Confluent staff in connection with the performance of the Advisory Services.  All Advisory Services may be delivered remotely unless otherwise agreed by the parties.

e.  Any tasks identified herein are intended merely to describe the scope of services that may be provided by Confluent.  Confluent will provide those services as directed and requested by Customer and only as time and budget allows. Confluent does not guarantee that the quantity of services purchased are sufficient to meet Customer's objectives.  It is the sole responsibility of Customer to prioritize efforts and necessary tradeoffs to ensure scope conforms to budget.

Page **22** of **22**

786\3328185.8